JOSEPH ROBERT GIANNINI, ESQ.
12016 Wilshire Blvd. Suite 5
Los Angeles CA 90025
Phone 310 804 1814
Email holmes@lawyers-inc.com

Attorney for Plaintiff,

**UNITED STATES DISTRICT COURT FOR THE**

**DISTRICT OF ARIZONA**

LAWYERS FOR FAIR RECIPROCAL ADMISSION,

Plaintiff,

v.

UNITED STATES, ATTORNEY GENERAL MERRICK B. GARLAND, MARY MURGUIA, CHIEF JUDGE NINTH CIRCUIT JUDICIAL COUNCIL AND HER HON. COUNCIL COLLEAUGES MICHAEL DALY HAWKINS, MORGAN CHRISTEN, SANDRA S. IKUTA, MICHELLE T. FRIEDLAND, ERIC D. MILLER, BRIAN MORRIS, MIRANDA M. DU, PHYLLIS J. HAMILTON, RONALD S. W. LEW;
G. MURRAY SNOW, CHIEF JUDGE OF THE DISTRICT OF ARIZONA AND HIS HON. DISTRICT JUDGE COLLEAGUES SUSAN M. BRNOVICH, DIANE J. HUMETEWA, DOMINIC W. LANZA, MICHAEL T. LIBURDI, STEVEN P. LOGAN, DOUGLAS L. RAYES, JOHN J.

Case No.: 2-22-cv-01221 PHX-MWM

AMENDED COMPLAINT FOR INJUNCTIVE & DECLARATORY RELIEF TO INVALIDATE U.S. DISTRICT COURT “LOCAL RULES” THAT DENY EQUAL & GENERAL ADMISSION PRIVILEGES TO LICENSED SISTER-STATE ATTORNEYS IN GOOD STANDING UNDER:

1. SEPARATION OF POWERS
2. FIRST AMENDMENT
   - PETITION FOR REDRESS OF GRIEVANCES & PRIOR RESTRAINT
   - CONTENT DISCRIMINATION
   - VIEWPOINT DISCRIMINATION
   - SPEAKER DISCRIMINATION
   - RIGHT TO ASSOCIATION WITH

TUCHI, JOHN C. HINDERAKER, ROSEMARY MÁRQUEZ , SCOTT H. RASH, JAMES A. SOTO, JENNIFER G. ZIPPS; PHILLIP S. GUTIERREZ, CHIEF JUDGE FOR THE CENTRAL DISTRICT OF CALIFORNIA AND HIS HON. DISTRICT JUDGE COLLEAGUES FERNANDO L. AENLLE-ROCHA, PERCY ANDERSON, ANDRE BIROTTE JR., STANLEY BLUMENFELD JR., MICHAEL W. FITZGERALD, MAAME EWUSI-MENSAH FRIMPONG, SHERILYN PEACE GARNETT, DOLLY M. GEE, JOHN W. HOLCOMB, R. GARY KLAUSNER, JOHN R. KRONSTADT, FERNANDO M. OLGUIN, VIRGINIA A. PHILLIPS, MARK C. SCARSI, JOSEPHINE L. STANTON, JOHN F. WALTER, STEPHEN V. WILSON, OTIS D. WRIGHT II, GEORGE H. WU, Marco A. Hernández, Chief Judge District of Oregon, and all of his District Court colleagues including Ann Aiken; David G. Estudillo, Chief Judge Western District of Washington and all of his District Judge colleagues; Stanley A. Bastian, Chief Judge Eastern District of Washington and all of his District Judge colleagues; Sharon Louise Gleason, Chief Judge of District of Alaska and all of her District Judge colleagues; Brian Morris, Chief Judge District of Montana and all of his District Judge colleagues; Miranda M. Du, Chief Judge District of Nevada and all of her District Judge colleagues; Derrick K. Watson, Chief Judge District of Hawaii and all of his District Judge colleagues including J. Michael

COUNSEL & RIGHT TO AVOID COMPELLED ASSOCIATION

3. SIXTH AMENDMENT RIGHT TO COUNSEL

4. 28 U.S.C. §1738

5. 28 U.S.C. § 332(d)(4)

6. FEDERAL RULES OF CIVIL PROCEDURE §§ 1, 83

7. 28 U.S.C. §§ 2071-72

8. FIFTH AND FOURTEENTH AMENDMENT RIGHTS TO EQUAL PROTECTION & EQUAL CITIZENSHIP RIGHTS & EQUAL PRIVILEGES AND IMMUNITIES

9. UNCONSTITUTIONAL CONDITIONS

10. FIFTH AMENDMENT PROCEDURAL DUE PROCESS & 28 U.S.C. § 455 DECLARATORY JUDGMENT (28 USC § 2201)

Seabright; David C. Nye, Chief Judge District of Idaho and all of this District Judge colleagues including Stephen W. Kenyon; Richard Seeborg, Chief Judge Northern District of California and all of his District Court colleagues; Dana M. Sabraw, Chief Judge Southern District of California and all of his District Judge colleagues; Kimberly Mueller, Chief Judge Eastern District of California and all of her District Court colleagues.

Defendants,

**THE JUSTICE GAP AND REASONS FOR THE GAPS IN JUSTICE**

1. Plaintiffs in this case challenge the United States District Court non-uniform local (sic) rules in the Ninth Circuit (and in all of the United States) that categorically deny full faith and credit licensing to lawyers licensed from forty-nine states. These non-uniform local (sic) rules on their face compel all citizens to either hire a local lawyer or forfeit their constitutional and statutory right to counsel. These non-uniform local rules are facially and fatally flawed because they are a classic *prior restraint* and constitute *viewpoint discrimination*.

2. This case is the story of the justice gap and reasons for that gap. Supreme Court Justice Neil M. GORSUCH recently made this justice gap clear in "Bridging

the Affordability Gap: It's Time to Think Outside the Box," 45 *Wyoming Lawyer* 16 (Apr. 2022):

> At some point just about every American will interact with our civil justice system. Whether it happens because of an eviction, a custody battle, a tort suit, or a contract claim, one thing is clear: Legal disputes are just as much a part of life as death and taxes. Yet today, legal services are increasingly difficult to obtain. A 2017 study found that low-income Americans fail to obtain adequate professional assistance with their legal problems 86% of the time. The vast majority don't even try to obtain professional help, and those who do are often turned away. According to another study, at least one party lacks legal representation in nearly 80% of civil cases in this country. The root cause for this state of affairs is not hard to discern: Legal services are expensive. Lawyers charge hundreds of dollars per hour for even the simplest of legal services. Even a single legal bill can prove financially devastating to many Americans.

2. Twenty-seven percent of all civil cases filed in the United States District Court had at least one *pro se* party.[1] The following chart depicts the numbers of total appeals and the shocking percentage of pro se appeals in all U.S. Circuit Courts of Appeals.[2]

| **Fiscal year** | **Total Appeals** | **Pro se appeals** | **Percentage pro se** |
|---|---|---|---|
| 2020 | 48,190 | 23,546 | 48.9% |
| 2019 | 48,486 | 23,728 | 48.9% |
| 2018 | 49,276 | 24,680 | 50.1% |

[1] **Just the Facts: Trends in Pro Se Civil Litigation from 2000 to 2019 | United States Courts (uscourts.gov)**

[2] **https://www.uscourts.gov/sites/default/files/data_tables/jff_2.4_0930.2020.pdf**

| | | | |
|---|---|---|---|
| 2017 | 50,506 | 25,366 | 50.2% |
| 2016 | 60,357 | 31,609 | 52,4% |
| 2015 | 52,698 | 26,883 | 51.0% |
| 2010 | 55,991 | 27,208 | 48.6% |
| 2005 | 68,469 | 28,555 | 41.7% |
| 2000 | 54,694 | 24,935 | 45.6% |
| 1995 | 50,072 | 19,973 | 39.8% |

3. Many lawyers, state bar association, and judges have a deep-seated and vested financial interest in preserving the justice gap, *i.e*. status quo. The quo has lost is status, however, having been rejected by the ABA, Uniform Bar Exam Commission, and some forty states.

4. The Los Angeles Times has reported an epidemic of California State Bar Association misconduct and judicial malfeasance that either stains or creates the appearance of partisanship bias when United States District Court local (sic) Rules delegate federal judicial duties to forum state officials. *See* Exhibit C:

• March 6, 2022 Vegas parties, celebrities and boozy lunches: How legal titan Tom Girardi seduced the State Bar ……………………………………………….........1
[Girardi bankrolled a lavish retirement bash for the Chief Justice Ron George of the California Supreme Court]……………………………………………...2,9

• June 10, 2022 State Bar admits 'mistakes' in handling complaints against 'Real Housewives' Tom Girardi…………………………………………………...19
[Girardi had kept his law license pristine despite numerous complaints against him at the State Bar as well as more than 100 lawsuits against him and his firm, many of them alleging misappropriation of funds]……………………………………...19

• July 13, 2022 His job was to police bad lawyers. He became Tom Girardi's broker to L.A.'s rich, powerful……………………………………………………..22

• August 4, 2022 Tom Girardi's epic corruption exposes the secretive world of private judges……………………………………………………………33
[For overseeing the settlement, retired California appellate Justice John K. Trotter Jr. and his private judging firm, JAMS (formerly known as Judicial Arbitration and Mediation Services), received a $500,000 cut]…………………………..............33

• August 9, 2022 Shocking' Tom Girardi scandal shows need for legal reforms, California chief justice says……………………………………………………….54
[California Chief Justice called revelations about the conduct of the retired judges, including a former state Supreme Court justice, "shocking" in a statement to The Times, acknowledging, "There are not adequate safeguards regarding the business of private judging."]

• August 31, 2022 A judge's affair with Tom Girardi, a beachfront condo and a $300,000 wire from his firm……………………………………………………..59
[Mistress of four years presiding justice of a state appeals court in downtown Los Angeles provided $300,000 gift]……………………………………….……….61

• October 28, 2022 When it comes to crooked colleagues, California lawyers can remain silent………………………………….........................................63

• November 21, 2022 FBI official files recusal in Girardi probe……………… 68
[Mother was secretary for Tom Girardi…. "she continued receiving hundreds of thousands of dollars from the legal legend.]

• December 17, 2022 Black men get brunt of State Bar's discipline…………….71
[State Bar study proves Black attorneys disproportionately investigated and disciplined: "There is not just one Girardi," Fellmeth said, adding, "They got 50 who worry the hell out of me."]……………………………………………….73

5. With modern technology, American lawyers can live and work anywhere in the world. They can, at their finger-tips, electronically file cases via PACER in any federal court, research the law, talk to their clients, and appear in any court via zoom. There is no empirical evidence that lawyers licensed in one state are any

more or less competent and trustworthy than licensed in another state. In essence, state imposed geographic barriers to access the United States District Courts are antiquated. These outdated “local” Rule barriers increase the justice gap. They serve no government interest other than preserving the status quo and enriching local lawyers and judges.

6. Justice Stevens lived in Florida and commuted to the Supreme Court for oral argument. Ninth Circuit judge Jerome Farris performed his judicial duties while living in Italy.

7. Plaintiffs allege it is not necessary to think outside the box. Plaintiffs allege the justice gap arises because our Founding principles set forth in the Federalist Papers, our Constitution, congressional statutes, federal rules, and Supreme Court precedent are breached.

8. The purpose of the Constitution is clear. It is for the benefit of the People with the goals to: (i) to form a more perfect Union; (ii) establish Justice; (iii) provide for the common defense, (iv) promote the general Welfare; (v) and secure the Blessings of Liberty to ourselves and our Posterity. Each of these central purposes, intended for the People, are defeated by local Rules that manifest a disunited Union, favor some citizens over others in establishing Justice, disconnect the common defense of life, liberty, and property, and secure the Blessings of Liberty for some citizens, but not others, in some United States Courthouses, but not others.

9. It has been generally, if not universally, considered that it is the chief purpose of the First Amendment's guaranty to prevent *prior restraints* upon publication. In its simple, most blatant form, a *prior restraint* is a law which requires submission of speech to an official who may grant or deny permission to utter or publish it based upon its contents. Any system of *prior restraints* of expression comes to this Court bearing a heavy presumption against its constitutional validity. The Government "thus carries a heavy burden of showing justification for the imposition of such a restraint." The challenged local Rules are a classic p*rior restraint* because they compel already licensed lawyers from forty-nine states to take a second, third, or fourth bar exam, or satisfy the whim of local Bar Association officials as a precondition to petition the District Court for the redress of grievances.

10. Our Union is founded on the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." The non-uniform local Rules breach this profound national commitment.

11. Supreme Court precedent over and over against has held the government has no power to restrict expression because of its message, its ideas, its subject matter, or its content. *Viewpoint discrimination* is an egregious from of content discrimination. *Viewpoint discrimination* occurs when the government favors one

speaker over another. *Viewpoint discrimination* is forbidden. The local Rules breach this Supreme Court *viewpoint* precedent.

12. The Supreme Court has also held: Any effort by the **Judiciary** to decide which means of communications are to be preferred for the particular type of message and speaker would raise questions as to the courts' own lawful authority. Substantial questions would arise if **courts** were to begin saying what means of speech should be preferred or disfavored. (Emphasis added). The local rules imposed by the courts nullify this precedent.

## INTRODUCTION – THE BIG PICTURE

13. In *Students for Fair Admission, Inc. v. President and Fellows of Harvard College*, Supreme Court docket #20-1199, college students argue that the Court's prior ruling that colleges can use *race* as a factor to pursue a diverse student body is *egregiously* wrong and it should be overturned. They further argue the Harvard *admission* standards do not comply with the Court's strict scrutiny jurisprudence. The evidence presented at trial shows *race* in admission at Harvard is not used as an incidental factor, but often the most important factor in the admission decision. The Supreme Court granted certiorari. Oral argument has been presented. A decision is soon expected. That student fair admission issue is similar to the lawyer fair admission issue presented in this case.

14. Here, this lawsuit concerns not *fair* student *admission* but *fair* lawyer *reciprocal admission* in the United States Courthouse. The right to fair student *admission* is not mentioned in the text of the Constitution. However, the Constitution textually safeguards federal and state *citizenship* rights and the precious *citizenship* freedoms to speech, association, and to petition the United States government with counsel for the redress of grievances. This case concerns the sordid business of facial federal discrimination concerning *citizenship* rights in the United States Courthouse. These *citizenship* rights at issue are set forth in the First Amendment, the separation of powers doctrine, Article IV § 2 and Fourteenth Amendment Privileges and Immunities Clauses, including the right to travel, the statutory right to counsel, the statutory right to full faith and credit, Equal Protection and Due Process.

15. Plaintiffs aver the attorney *admission* local rules that deny reciprocal admission to lawyers in good standing licensed in forty-nine states and that compel all American citizens to associate with a forum state lawyer or forfeit their statutory right to counsel in the United States District Court are antiquated, egregiously wrong, and facially unconstitutional. Plaintiffs aver the balkanized and uneven local rules have nothing what-so-ever to do with merit or competence: All novice forum state attorneys (the *special favorites*) are categorically qualified, and all experienced lawyers from forty-nine states (the *subordinate second-class citizens*) are categorically disqualified. "[T]he concept that government may restrict the speech

of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment." *Citizens United v, FEC*, 130 S.Ct. 876, 905 (2010). These nonuniform and disparate local rules are constructed on the absurd and arbitrary fiction — that forum state law that has no jurisdiction or application outside of the forum state — should control federal jurisdiction and application of federal law inside the United States Courthouse. This is delegation running riot. *See* Separation of Powers Cause of Action ¶¶ 106-116.

16. Plaintiffs further aver that prior court decisions upholding this federal local Rule discrimination under the *professional speech* doctrine and rubber-stamp *rational* basis in the Third Circuit and in most circuits fail to appreciate the liberties at stake, and equally important, have been overturned.[3] The Ninth Circuit moved

[3]*NAAMJP v. Simandle*, 658 Fed.Appx. 127 (3d Cir. 2016), unpublished 3rd Circuit 2016 upholding N. J. District Court local rules as *rational* and relying on the *professional speech doctrine*. The Third Circuit held "The assumptions underlying these rationales may be erroneous, but the very fact that they are arguable is sufficient, on rational-basis review, to immuniz[e] the [rule] from constitutional challenge." *Id*. at 130. *NAAMJP v. Lynch*, 826 F. 3d 191 (4th Cir. 2016), upholding District Court local rules under *rational* basis review. "[T]he *professional speech* doctrine allows the government to "license and regulate those who would provide services to their clients for compensation without running afoul of the First Amendment." *Id*. at 195. *NAAMJP v. Howell*, 851 F. 3d 12, 19-20 (D.C. Cir. 2017) upholding local rules as *rational* relying on the *professional speech* doctrine. Each of these cases upholding local rules as *rational* under the *professional speech doctrine* cite each other as precedent. Thus, misapplication of law based on the so-called *professional speech* doctrine and *rational* basis review is piled on each other.

from *rational* basis to the *intermediate* standard of review in 2005.[4] However, the Supreme Court has recently and squarely rejected the so-called *professional speech* doctrine. *See NIFLA v. Becerra*, 138 S.Ct. 2361 (2018), overturning the Ninth Circuit and citing with disapproval lower court decision applying the so-called *professional speech* doctrine. The Supreme Court has also squarely held *rational basis* review is foreign to its First Amendment jurisprudence. *See Janus v. American Federal of State, County, and Municipal Employees* 138 S. Ct. 22448, 2465 (2018) ("This form of minimal [rational basis] scrutiny is foreign to our free-speech jurisprudence."). See also *Reed v. Town of Gilbert,* 135 S.Ct. 2218 (2015) overturning the Ninth Circuit's definition of content-discrimination. These decisions will be discussed hereinafter.

17. These non-uniform local rules are further obnoxious to Congressionally enacted rulemaking authority. In 1988, Congress enacted 28 U.S.C. § 332(d)(4) expanding the role of the Circuit Judicial Council requiring the Council to periodically review District Court local rules. *See* Exhibit A1-2 Reporter's Comment. Section 332(d)(4) provides:

---

[4] *See NAAMJP v. Berch*, 773 F.3d 1037 (9th Cir. 2014), upholding and applying intermediate time, place, manner review to First Amendment bar admission challenge to Arizona District Court local Rules; *Mothershed v. Justices of Sup. Court*, 410 F. 3d 602, 611 (9th Cir. 2005)(applying intermediate review to case filed by a licensed attorney questioning Arizona Supreme Court rules). However, intermediate review is by definition inapplicable when the government engages in content, or viewpoint, or speaker discrimination.

> Each judicial council shall periodically review the rules which are prescribed under section 2071 of this title by district courts within its circuit for consistency with rules prescribed under section 2072 of this title…

According to the Congressional Reporter, the "amendment § 332 to add a new paragraph (d)(4) was a consequence of widespread discontent," communicated to Congress, about "a proliferation of local rules." (Exhibit A1). Congress found that the rule-making procedures "lacked sufficient openness" and that local rules often "conflict with national rules of general applicability." *Ibid.* Congress also placed on the judicial councils a mandatory periodic duty of review because it concluded "effective appellate review of such a [local] rule [is] impossible sometimes, impractical most times, and impolitic always" (Exhibit A2) because the judges who enact the local rules decide whether they are lawful. "There is no such thing as a rule's becoming sacrosanct merely for having passed judicial scrutiny the first time. It is subject to ongoing scrutiny." *Id*.

18. Congress also legislated an interlocking fourfold standard of review for District Court local rules. Section 2071(a) provides:

> The Supreme Court and all courts established by Act of Congress may from time to time prescribe rules for the conduct of their business. *Such rules shall be consistent with Acts of Congress and rules of practice and procedure prescribed under section 2072 of this title.* (Emphasis added)
>
> 28 U.S. Code § 2072 (b) provides:
>
> *Such rules shall not abridge, enlarge or modify any substantive rights***.** (Emphasis added)

Additionally, *Federal Rule of Civil Procedure* 83(a)(1) was amended in 1995. Rule 83. *Rules by District Courts*, provides*:*

> "A local rule must be consistent with—but not duplicate—federal statutes and rules adopted under 28 U.S.C. §§2072 …,."

19. Thus, the standard of review set forth in § 2071(a) for local rules is incorporated by reference into the standard of review for nationally promulgated rules set forth in § 2072(b). This stricter than strict scrutiny standard is doubled-down and further set forth in 28 U.S.C. 332(d)(4) and FRCP 83(a)(1). It is stricter than strict scrutiny because it applies to all substantive rights, not just constitutional rights. This standard makes perfect sense because judges are not legislators. Congress commanded that local rules shall provide an even playing field. The home team does not get to start the game with a grand-slam lead. Judges are supposed to call balls and strikes; not legislate.

20. The law *is* what the law *says*. The law *says* local rules "shall not abridge, enlarge, or modify and substantive rights." (§ 2072(b)). The law *says* local rules "shall be consistent with Acts of Congress." (§ 2071(a)). The challenged local rules directly contradict what the law *is* and what the law *says*. Reasonable minds cannot differ what the law *says*. The United States Attorney General MERRICK B. GARLAND is either well aware or he should be aware the law is not being faithfully executed.

21. There is no difference in attorney licensing, regardless of the state of admission or office location, in the United States Supreme (Supreme Court Rule 5); U.S. Courts of Appeal (FRAP 46); or practice before federal administrative agencies (5 U.S.C. § 500(b), as there is no difference in marriage license full faith and credit based on forum state law or office location in the federal context. These national attorney admission rules are enacted by Congress (5 U.S.C. § 500(b)), or submitted to and approved by Congress (FRAP 46, Rule 5). Rule 5, however, requires three years of experience for *general* admission privileges in the Supreme Court. Lawyers with less than three years of experience are eligible for *pro hac vice* admission. These District Court local rules are the result of a historical accident. The *Federal Rules of Civil Procedure* were first promulgated in 1934, back in the separate but equal era, when the *Federal Rules of Civil Procedure* replaced state procedure. Thus, members of the bar in good standing are free to represent their clients at the highest and lowest levels of the federal judiciary, but not in the majority of District Courts because of home-town monopoly protecting local rules.

22. One does not need to be a prophet or the son of a prophet to conclude that if all men are created equal — all lawyers are created equal. Lawyers serve important constitutional functions in our Union. They vindicate federal rights and champion locally unpopular claims. They ensure citizens will not be deprived of life, liberty, and property without due process of law. They function as an independent check and

balance on government overreaching. They explain and interpret the law for citizens in a confidential attorney-client setting. They serve the courts by presenting client claims, without which justice cannot be rendered. Litigation on matters of public concern is often the only means to vindicate federal rights. Confronted with the deprivation of life, liberty, or property by the government, some citizens believe their choice of independent counsel is priceless. It can be more precious than their choice of spouse or religion.

23. Plaintiff LAWYERS FOR FAIR RECIPROCAL ADMISSION and its members, challenge the categorical bar admission local rules in the Ninth Circuit for experienced sister-state attorneys in good standing. These local rules on their face plainly and unambiguously *abridge*, *enlarge*, and *modify* every known Constitutional and substantive right in one sweep by *enlarging* and providing a patent and monopoly on these rights in the United States District Courthouse to the *special favorite* forum state licensed attorneys, and *abridging* and *modifying* these same Constitutional and substantive rights for out-of-state licensed lawyers from forty-nine states, who are presumed subordinate citizens and inherently inferior.

24. In the 1960s, before cable and the internet, television stations came in three flavors, channels 3,6, and 10. In this 21st Century information age, local rules in our more perfect Union come in three flavors. One-third of the 94 District Courts do not discriminate for or against any class of lawyers or citizens. That is, they

pledge allegiance and salute "the flag… [of] one nation under God indivisible with liberty and justice for all." The Western District of Pennsylvania local rules are an example.

25. A second flavor is demonstrated by the local rules in the District of Arizona that vicariously adopt the out-of-state bar admission rules of the Arizona Supreme Court. The Arizona Court does not have extra-territorial jurisdiction over the bar admission rules in other states or in the federal courts. State supreme court justices are elected officials and dependent on locally popular opinion and campaign contributions to stay in office. State supreme court justices can and have been voted out of office for locally unpopular decisions. The Arizona Supreme Court, working in concert with the Arizona Bar Association, has adopted tit-for-tat out-of-state attorney licensing rules. These state licensing rules are tit-for-tat because they grant reciprocal admission on motion to experienced out-of-state attorneys, if those attorneys are licensed in states that provide admission on motion to Arizona licensed lawyers. The purpose and principal effect of tit-for-tat state admission rules is to provide monopoly protection. The "tying agreement" between the Arizona District Court and the Arizona Bar Association presume that Arizona State Bar officials can do no wrong and licensing officials in other states can do no right. Plaintiffs allege there is no evidence that licensed lawyers in any state are more or less competent, dedicated, or ethical than lawyers licensed in other states.

26. The third flavor is exemplified by the local rules in the Central District of California that piggy-back the California Supreme Court admission rules for out-of-state attorneys. In the four District Courts of California, in order to qualify for *general* admission privileges an experienced sister-state attorney is compelled to reinvent the wheel and pass the State of California's entry-level licensing in order to obtain *general* admission privileges.

27. According to national studies undertaken by the American Bar Association, experienced attorneys have already established their competence by their admission and have demonstrated that they are not a threat to the public by their experience. The ABA has concluded experienced attorneys do not need to take another entry-level bar exam. The ABA recommends all states and federal district court provide reciprocal admission on motion to sister-state attorneys in good standing. In 2019, over 16,000 lawyers were admitted to the bar of a second state either by admission on motion for experienced attorneys or transfer of UBE scores. Forty-one states have adopted the UBE exam including Arizona, which does not test state law. Only eight states have not adopted some form of full faith and credit reciprocal admission on motion .[5]

---

[5] California, Delaware, Florida, Hawaii, Louisiana, Nevada, Rhode Island, and South Carolina.

28. The practice of law requires the application of fact to law. Facts change over time. People change. Technology changes. Even viruses change. The pandemic has accelerated the "new normal." People, including lawyers and judges, often work remotely. Law changes. Every year Congress amends and enacts new laws. The Supreme Court annually overrules lower court decisions. Many of these cases are decided 5-4. Judges looking at the same facts and law reach contradictory conclusions. The Supreme Court has overturned Congressional statutes forty-seven times in the last four decades. The Court often overrules itself. Congress also enacts new laws overruling Supreme Court decisions. Evolving standard of decency are standards that are evolving. The destiny of man is not repose. As Chief Justice ROBERTS has stated, "the Act imposes current burdens and must be justified by current needs." *Shelby County, Ala. v. Holder*, 133 S. Ct. 2612, 2619 (2013).

29. This case raises several issues of first impression of fact and law. It calls into question the power of United States Courts to prescribe local rules in light of the Constitution, Congress, the *Rules Enabling Act*, and Supreme Court precedent. It also calls into question the *validity*, *reliability*, and *fairness* of the fiction that already licensed attorneys should be required to take a second and third and fourth entry-level state licensing exam to be admitted in another state or federal district court in this 21st Century.

**RECENT SUPREME COURT FIRST AMENDMENT PRECEDENT PROVES BEYOND ANY DOUBT THE DISPARATE LOCAL RULES ARE FACIALLY UNLAWFUL**

30. Plaintiffs allege the following First Amendment decisions are dispositive. The challenged local rules restrict expression and are presumptively and obviously unlawful because the government cannot meet its strict scrutiny and narrow tailoring burden of proof. The Supreme Court has recently overturned Ninth Circuit First Amendment speech licensing decisions that are relevant here: *Reed v. Town of Gilbert*, 135 S.Ct. 2218 (2015) and *NIFLA v. Becerra*, 138 S.Ct. 2361 (2018). Plaintiffs rely on the Third Circuit decision that was overturned in *Fulton v. City of Philadelphia*, 141 S.Ct. 1868 (2021). Plaintiffs also rely on *Janus v. American Federal of State, County, and Municipal Employees* 138 S. Ct. 22448, 2465 (2018) overruling *Abood v. Detroit Bd. Of Educ.*, 431 US 209 (1977*):* and *Williams-Yulee v. Florida Bar*, 575 U. S. 433, ___, 135 S.Ct. 1656, 1665, 191 L.Ed.2d 570 (2015).

31. In *Reed v. Town of Gilbert, supra*, 135 S.Ct. 2218 (2015), the Supreme Court overturned a Ninth Circuit's decision that provides authoritative interpretative direction on *content-discrimination*. In a sign licensing case, the Ninth Circuit applied intermediate scrutiny, concluding the speech restrictions on the signs were content-neutral, and thus subject to time, place, or manner speech review. It held the different sign categories were content-neutral because the government did not adopt the various categories because of animus or disagreement with the messages

on the signs. The issue before the Supreme Court was the interpretative difference between *content-neutral* and *content-discrimination*. The Supreme Court held:

> But this analysis skips the crucial first step in the content-neutrality analysis: determining whether the law is content neutral on its face. **A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of "animus toward the ideas contained" in the regulated speech**. *Id*. at 2228 (Emphasis added)

The Supreme Court held under the First Amendment:

> Under that Clause, a government, including a municipal government vested with state authority, "**has no power to restrict expression because of its message, its ideas, its subject matter, or its content**." (internal cites omitted) Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests. (internal cites omitted) *Id*. at 2226. (Emphasis added.)

32. In this local Rule challenge, the *subject matter* is federal law and federal procedure. The *content* at issues is federal law and federal procedure. There is no constitutional difference between *content* on a sign and *content* in a pleading. They both contain *messages* and *ideas*. They seek to persuade. For First Amendment purposes, there is no constitutional difference between *speech* and *speaker*. *See Reed*, "Because [s]peech restrictions based on the identity of the speaker are all too often simply a means to control content," … we have insisted that "laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference." *Id*. at 2230. As the multiple sign-code

targeted speech *content* categories and *messages* in *Reed* were held presumptively unconstitutional and subject to strict review, Plaintiff avers the disparate local rules targeting attorney speech, association, and petition freedoms are presumptively unconstitutional and subject to strict scrutiny review. The government has the burden of proof. A government's benign motive and lack of animus toward a speaker does not save restrictions on speech. Plaintiffs aver the challenged local rules cannot pass the strict scrutiny test because one-third of the ninety-four federal district courts authorize *general* admission privileges to all sister-state attorneys in good standing. The subject local rules are the opposite of narrow tailoring.

33. In *Becerra*, *NIFLA v. Becerra*, *supra*, 138 S.Ct. 2361 the High Court overturned another Ninth Circuit decision in a *speech licensing* case under the so-called "professional speech doctrine." *Becerra* reasons

> "this Court has not recognized "professional speech" as a separate category of speech. Speech is not unprotected merely because it is uttered by 'professionals.' This Court has 'been reluctant to mark off new categories of speech for diminished constitutional protection.'" *Id*. at 2371-72.

According to *Becerra*, the Ninth Circuit mistakenly applied intermediate scrutiny review applicable to time, place, or manner restrictions in a *professional speech licensing* case. The *Becerra* Court reversed and applied strict scrutiny to the *speech* licensing content-discrimination. The Supreme Court in *Becerra* also cited with disapproval other decisions by the Ninth, Third, and Fourth Circuits upholding exceptions to full First Amendment protection in prior "professional speech"

licensing cases.[6] The Third, Fourth, Ninth, and District of Columbia Circuits previously upheld challenges to local rules relying on the so-called "professional speech" doctrine, citing each other's decisions under the professional speech doctrine, and citing each other's precedent applying rubber stamp review.[7] They cite the same inter-circuit "professional speech" precedent the Supreme Court expressly disapproved in *Becerra*. The Plaintiff speakers are all *licensed* lawyers in good standing. The issue presented with this local Rule challenge is *professional speech* licensing in this 21st Century.

34. *Becerra* holds speech uttered by professionals is First Amendment protected except in two narrow circumstances, neither of which is relevant here. As stated by *Becerra*, 138 S.Ct. at 2372 (2018):

> This Court's precedents do not recognize such a tradition for a category called "professional speech." This Court has afforded less protection for professional speech in two circumstances—neither of which turned on the fact that professionals were speaking. First, our precedents have applied more deferential review to some laws that require professionals to disclose factual, noncontroversial information in their "commercial speech."

---

[6] *See Becerrra*, 138 S. Ct. at 2371-72:

> Some Courts of Appeals have recognized "professional speech" as a separate category of speech that is subject to different rules. See, *e.g.*, *King v. Governor of New Jersey*, 767 F.3d 216, 232 (C.A.3 2014); *Pickup v. Brown*, 740 F.3d 1208, 1227-1229 (C.A.9 2014); *Moore-King v. County of Chesterfield*, 708 F.3d 560, 568-570 (C.A.4 2013)
>
> …
>
> But this Court has not recognized "professional speech" as a separate category of speech. Speech is not unprotected merely because it is uttered by "professionals."

[7] *See* footnote 1-4,

> See, *e.g.*, *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985); *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 250, 130 S.Ct. 1324, 176 L.Ed.2d 79 (2010); *Ohralik v. Ohio State Bar Assn*., 436 U.S. 447, 455-456, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978).

35. The first exception is attorney *adverting disclosure* requirements:

> "In *Zauderer*, for example, this Court upheld a rule requiring lawyers who *advertised* their services on a contingency-fee basis to disclose that clients might be required to pay some fees and costs. ____. Noting that the *disclosure* requirement governed only 'commercial advertising' and required the disclosure of "purely factual and uncontroversial information about information about the terms under which . . . services will be available.'" *NIFLA v. Becerra*, 138 S.Ct. at 2372.

*Milavetz* is also an *advertising disclosure* case.

36. The second exception also concerns professional speech incidental to unlawful professional conduct. In *Ohralik v. Ohio State Bar Assn*., 436 U. S. 447 (1978), an attorney solicited two young accident victims at a time when they were especially incapable of making informed judgments or of assessing and protecting their own interests. An eighteen-year-old girl was in a hospital room where she lay in traction. The other eighteen-year-old girl was solicited on the day she came home from the hospital. The attorney employed a concealed tape recorder apparently to verify their consent to the representation agreement. The girls subsequently discharged counsel. He refused to withdraw and continued to represent one of the clients without permission. He charged and collected one-third contingent fee from the other client despite being terminated. This conduct, which the attorney never

disputed, was inconsistent with an attorney's fiduciary obligation to fairly and fully disclose to clients his activities affecting their interests. *Id*. at 469.

*Ohralik* challenged his conviction for unethical conduct. *Ohralik* argued there was no constitutional difference between attorney *solicitation* and attorney *advertising* the Court had allowed in *Bates*. The Court rejected this argument, reasoning "[t]he entitlement of in-person solicitation of clients to the protection of the First Amendment differs from that of the kind of advertising approved in *Bates*, as does the strength of the State's countervailing interest in prohibition." *Id*. at 445. Petitioner conceded that the State has a legitimate and indeed "compelling" interest in preventing those aspects of solicitation that involve fraud, undue influence, intimidation, overreaching, and other forms of vexatious conduct." *Id.* at 462. The Court held "that the State—or the Bar acting with state authorization—constitutionally may discipline a lawyer for soliciting clients in person, for pecuniary gain, under circumstances likely to pose dangers that the State has a right to prevent." *Id*. at 449. The Court did not hold, however, that restraints on attorney speech are not subject to First Amendment scrutiny. The Court simply held the discipline at issue did not require reversal under the First Amendment. *Ohralik* is a *solicitation* case. It is speech incidental to the commission of unlawful activity that is not protected by the First Amendment. For example, if an attorney walks into a bank

and says to the teller "put the money in this bag," that is speech incidental to unlawful conduct that is not constitutionally protected.

37. The Supreme Court has also recently and squarely held the *rational basis* standard of review is foreign to restrictions on First Amendment freedoms. *See Janus v. American Federal of State, County, and Municipal Employees , supra*, 138 S. Ct. 22448, 2465 (2018) ("This form of minimal [rational basis] scrutiny is foreign to our free-speech jurisprudence.").

38. It is also self-evident this case does *not* implicate an exception to First Amendment coverage for the precious freedoms to speech, association, and petition. The exceptions are spelled out in *Reed*, *Becerra*, and *U.S. v. Stevens*, 559 US 460 130 S.Ct. 1577 (2010),

> "From 1791 to the present," however, the First Amendment has "permitted restrictions upon the content of speech in a few limited areas," and has never "include[d] a freedom to disregard these traditional limitations." (Internal cites omitted) These "historic and traditional categories long familiar to the bar," (Internal cites omitted)— including obscenity, (Internal cites omitted) defamation, (Internal cites omitted) fraud, (Internal cites omitted) incitement, and speech integral to criminal conduct, (Internal cites omitted) — are "well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem," (Internal cites omitted). *Id*. at 1584.

In *Stevens*, the Court rejected an exception for depictions of animal cruelty. *Id*. at 1583. In *Snyder v. Phelps*, 562 US 443 (2011), the Court held the First Amendment shielded groups picketing at the funerals of military veterans from tort liability.

39. Plaintiffs allege, as licensed attorneys, they will not be dancing nude, publishing defamatory remarks, engaging in fraud, or inciting the public to riot *in United States courtrooms*. And if such imminent unlawful conduct did occur, the probability of which is akin to being struck by lightning, the Court has adequate opportunity and means to punish counsel and such contemptible *conduct*.

40. In *Fulton v. City of Philadelphia*, 141 S.Ct. 1868 (2021), the City of Philadelphia refused to allow a Catholic Services organization to continue to place adopted children in homes unless the religious organization agreed to certify same sex marriage couples as foster parents. Petitioner challenged this law under the First Amendment free *speech* and free *exercise* clauses. The District Court and the Third Circuit upheld this law as a *neutral* and *generally applicable* law. The Supreme Court unanimously invalidated this law under the free exercise clause, and thus did not address the free speech claim. The Court ruled that “it is plain that the City's actions have burdened CSS's religious exercise by putting it to the choice of curtailing its mission or approving relationships inconsistent with its beliefs.” *Id*. at 1874. Concerning *neutrality*, “Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature. *Id*. 1877. Concerning *general applicability*, the Court held, “A law is not generally applicable if it "invite[s]" the government to consider the particular reasons for a person's conduct by providing "’a mechanism for individualized exemptions.'"

*Id*. at 1877. "The question, then, is not whether the City has a compelling interest in enforcing its non-discrimination policies generally, but whether it has such an interest in denying an exception to CSS." *Id*. at 1881.

41. Here, Plaintiffs aver the local rules in the Ninth Circuit and in other Circuits are not *neutra*l and *generally applicable* because they favor the *viewpoints* and the *speech* of forum state lawyers and they disfavor the *viewpoints* and *speech* of lawyers licensed in forty-nine other states. They are not *neutral* because they compel all citizens to put their faith in a forum state attorney or forfeit their substantive right to counsel in the U.S. District Courthouse. They are not *generally applicable* because there are a host of exceptions to admission under the local rules and under the state laws including tit-for-tat provisions that some District Courts vicariously adopt. Federal government lawyers can be admitted anywhere. Plaintiffs further allege the compelling question here is not whether District Judges have a compelling interest in preserving their *general* admission local rules; rather, the question is whether they have a compelling interest in not providing an exception for admission to lawyers licensed in forty-nine states, when one-third of the District Court do not restrict *general* admission privileges to forum state lawyers. Plaintiffs allege there is no constitutionally analytical difference between government-imposed restrictions on free *exercise* and the right to freely *petition the government* for the *redress of grievances*. Plaintiffs aver if the government is prohibited from

compelling citizens to exercise a specific religion, it is prohibited from compelling citizens to associate and petition the government with a specific mandatory bar association. The citizen's right to *independent* counsel to speak on his or her behalf is priceless.

42. In *Williams-Yulee v. Florida Bar*, 575 U. S. 433, ___, 135 S.Ct. 1656, 1665, 191 L.Ed.2d 570 (2015), the Supreme Court applied strict scrutiny review and upheld restrictions on attorney speech in the context of a judicial election. The question at issue was whether an attorney running for a judgeship could request money directly from a campaign contributor or whether the solicitation must be made by the candidate's election committee. The Court held a State may assure its people that judges will apply the law without fear or favor — and without personally asking anyone for money. It thus affirmed the judgment of the Florida Supreme Court imposing professional misconduct under the strict scrutiny standard of review.

43. Plaintiffs aver the strict scrutiny standard of review is applicable and the unpublished Third Circuit decision in *NAAMJP v. Simandle*, 658 Fed.Appx. 127 (3d Cir. 2016) upholding N. J. District Court local rules as *rational* and relying on the *professional speech doctrine*[8] is clearly erroneous based on the above noted Supreme Court decisions, which control the outcome here.

[8] *See* footnotes 1-4.

44. The Supreme Court has never decided the local Rule legal question presented in this case on the merits. Plaintiffs' separation of powers claim has never been adjudicated by any lower court upholding local rules. Plaintiffs' argument that requiring experienced attorneys to take and pass a second state's entry level bar exam fails to meet nationally recognized testing *Standards* has never been presented or decided. Plaintiffs will address other significant irregularities in prior lower court decision upholding local rules as *rational* hereinafter. Plaintiffs aver a blind man can see the challenged local rules are unconstitutional.

**JURISDICTION AND VENUE**

45. This District Court has jurisdiction under 28 U.S.C. § 1331. Venue is appropriate in this District Court whose local rules are being challenged and where its Chief Judge is also a member of the Ninth Circuit Judicial Council. Jurisdiction and venue against the United States and the out-of-state defendants is provided by 28 U.S.C. § 1391(e); *Stafford, U.S. Attorney v. Briggs*, 444 U.S. 527, 534 (1980).[9] *United States v. Windsor*, 133 S.Ct. 2675 (2103), holding the United States government is required to afford gay and lesbian couples Fifth Amendment Equal Protection and their marriage licenses full faith and credit.

[9] "The purpose of this bill [Section 1391 (e) amendment] is to make it possible to bring actions against Government officials and agencies in U.S. district courts outside the District of Columbia, *which, because of certain existing limitations on jurisdiction and venue, may now be brought only in the U. S. District Court for the District of Columbia*." *Id.* at 539-40. (Emphasis in original).

## PARTIES

46. Plaintiff LAWYERS FOR FAIR RECIPROCAL ADMISSION is a corporation organized for public benefit under California law with offices in Los Angeles, CA. Like *Citizens United v. Federal Election Commission*, 130 S.Ct. 876 (2010) holding corporations have First Amendment rights, Plaintiff is engaged in interstate commerce and advocacy. *Citizens United* challenged a prior restraint formulated by the Federal Election Commission. This restraint prohibited it from speaking at certain times and places about Hilary Clinton. Likewise, Plaintiff is prohibited from speaking and litigating matters of public concern by the balkanized and uneven local rules. Plaintiff as a consumer of legal services and as an advocate is directly injured by local rules in the Ninth Circuit that compel it, and its counsel of choice, to associate and compel it to make payments to mandatory public unions as a condition precedent to exercise federal rights in United States courthouses.

47. Plaintiff has members and associates who have been deprived of their citizenship rights by the challenged local rules. “An association can bring claims on behalf of its members.” *See Summers v. Earth Island Inst*., 555 U.S. 488, 494, (2009). These members, are often lawyers, that have an independent constitutional duty to vindicate federal rights and champion locally unpopular federal claims. Once standing is established for one plaintiff the court need not address the standing of

each plaintiff. [10] These members and associates are willing to submit Declarations and testify in open Court under oath attesting to their injures. They include lawyers of color, patent lawyers, military veterans and their wives, registered in-house counsel lawyers, registered indigent service lawyers, federal practice specialists, and members of the bar in good standing who maintain their principal office in a state where they are not licensed. The right to associate includes the right not to associate. The First Amendment protects the freedom of conscience in addition to association. Many members and associates abhor and do not want to subsidize or be compelled to associate with California or Arizona Bar Association public unions because of the political causes and messages they endorse. They do not want to pay state taxes and get down on their knees and salute the Arizona or California flag in order to exercise their substantive rights in the United States courthouse.

48. The lead defendant is the United States. *See* 28 U.S.C. § 1391(e)(1)& (2) authorizing suits against the United States and its officials for *actions* and *inaction* whereby citizens are injured and nationwide service of process. The United States has been a party in similar lawsuits challenging government conduct exceeding authorized discretion. *See United States v. Windsor*, *supra*; *Milavetz, Gallop &*

[10] *California ex rel. Imperial Cnty. Air Pollution Control Dist. v. U.S. Dep't of the Interior*, 767 F.3d 781, 789 (9th Cir.2014) ("We need not address the standing of each plaintiff if we conclude that any plaintiff has standing.") (citing *Nat'l Ass'n of Optometrists & Opticians v. Brown*, 567 F.3d 521, 523 (9th Cir.2009)).

*Milavetz, P.A. v. United States*, *supra*; *New York Times Co. v. United States*, 403 US 713 (1971); *National Society of Engineers v. United States*, 435 U.S. 679 (1979); *Texas v. United States*, 809 F. 3d 134 (5th Cir. 2015), affirmed by an evenly divided Supreme Court; *Duplantier v. United States*, 606 F.2nd 654 (7th Cir. 1979). The Supreme Court has squarely held that it has *supervisory* jurisdiction over Federal District Court local rules. *Frazier v. Heebe*, 482 U.S. 641 (1987). Plaintiffs aver the United States must be a proper party if the Supreme Court's *supervisory* appellate jurisdiction is too be maintained.

49. Defendant Attorney General MERRICK B. GARLAND has a constitutional duty to assure the laws are faithfully executed. He is the central official driving these First Amendment speech-restrictions and seeking to preserve the status quo long after the quo that has lost its status. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, (2010)(unanimously holding speech restrictions on attorneys representing foreign terrorists are subject to strict scrutiny review). "[T]he United State attorney is a representative not of an ordinary party to a controversy, but of the sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore… is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 US 78, 88 (1935). His Honor is well aware that the laws enacted by Congress are not being faithfully executed and First Amendment restrictions are subject to strict scrutiny review. Plaintiffs aver

His Honor has a duty to adhere to *Holder v. Humanitarian Law Project* and concede these local rules are unlawful.

50. The defendants include MARY MURGUIA, CHIEF JUDGE NINTH CIRCUIT JUDICIAL COUNCIL AND HER HON. COUNCIL COLLEAUGES MICHAEL DALY HAWKINS, MORGAN CHRISTEN, SANDRA S. IKUTA, MICHELLE T. FRIEDLAND, ERIC D. MILLER, PHILLIP S. GUTIERREZ, BRIAN MORRIS, MIRANDA M. DU, PHYLLIS J. HAMILTON, RONALD S. W. LEW. In recent years many members of the Ninth Circuit Judicial Council have been made aware of the vast majority of allegations in this Complaint, including Exhibits A and B. Exhibit B demonstrates the 100% subjective bar exam experienced lawyers are required to take for federal admission has a standard error of measurement shoddier than .48 and it is not a valid licensing test according to multiple testing experts. Some California District Judges resign early or resign after retirement can go to work for the California Courts of Appeal, where the pay scale is higher. One present California Supreme Court justice previously served on the Northern District of California. One Ninth Circuit Appellate judge is married to a recently resigned California Supreme Court justice. Some people reasonably believe there appears to be a gentleman's agreement between the state and federal courts that interferes with out Union of checks and balances.

51. The defendants are G. MURRAY SNOW, CHIEF JUDGE OF THE DISTRICT OF ARIZONA AND HIS HON. DISTRICT JUDGE COLLEAGUES SUSAN M. BRNOVICH, DIANE J. HUMETEWA, DOMINIC W. LANZA, MICHAEL T. LIBURDI, STEVEN P. LOGAN, DOUGLAS L. RAYES, JOHN J. TUCHI, JOHN C. HINDERAKER, ROSEMARY MÁRQUEZ , SCOTT H. RASH, JAMES A. SOTO , JENNIFER G. ZIPPS.

52. The defendants are PHILLIP S. GUTIERREZ, CHIEF JUDGE FOR THE CENTRAL DISTRICT OF CALIFORNIA AND HIS HON. DISTRICT JUDGE COLLEAGUES FERNANDO L. AENLLE-ROCHA, PERCY ANDERSON, ANDRE BIROTTE JR., STANLEY BLUMENFELD JR., MICHAEL W. FITZGERALD, MAAME EWUSI-MENSAH FRIMPONG, SHERILYN PEACE GARNETT, DOLLY M. GEE, JOHN W. HOLCOMB, R. GARY CLAUSNER, JOHN R. KRONSTADT, FERNANDO M. OLGUIN, VIRGINIA A. PHILLIPS, MARK C. SCARSI, JOSEPHINE L. STANTON, JOHN F. WALTER, STEPHEN V. WILSON, OTIS D. WRIGHT II, GEORGE H. WU.

53. The defendants are Marco A. Hernández, Chief Judge District of Oregon, and all of his District Court colleagues including Ann Aiken. Judge Aiken was previously the Chief Judge and served as a member or observer of the Ninth Circuit Judicial Counsel for five years.

54. The defendants are David G. Estudillo, Chief Judge Western District of Washington and all of his District Judge colleagues.

55. The defendants are Stanley A. Bastian, Chief Judge Eastern District of Washington and all of his District Judge colleagues.

56. The defendants are Sharon Louise Gleason, Chief Judge of District of Alaska and all of her District Judge colleagues. Her Honor presently serves as an observer for the Ninth Circuit Judicial Council.

57. The defendants are Brian Morris, Chief Judge District of Montana and all of his District Judge colleagues. His Honor presently serves as a member of the Ninth Circuit Judicial Council.

58. The defendants are Miranda M. Du, Chief Judge District of Nevada and all of her District Judge colleagues. Her Honor presently serves as a member of the Ninth Circuit Judicial Council.

59. The defendants are Derrick K. Watson, Chief Judge District of Hawaii and all of his District Judge colleagues including J. Michael Seabright, who recently served as the Chief Judge and Member of the Ninth Circuit Judicial Council

60. The defendants are David C. Nye, Chief Judge District of Idaho and all of this District Judge colleagues including Stephen W. Kenyon who presently serves as an observer of the Ninth Circuit Judicial Council.

61. The defendants are Richard Seeborg, Chief Judge Northern District of California and all of his District Court colleagues.

62. The defendants are Dana M. Sabraw, Chief Judge Southern District of California and all of his District Judge colleagues;

63. The defendants are Kimberly Mueller, Chief Judge Eastern District of California and all of her District Court colleagues.

## FACTS

### A. Requiring Already Licensed Attorneys to Retake and Pass a Second State's Entry-Level Bar Exam Trespasses Federally Recognized Licensing *Standards* and ABA Approved Recommendations

#### (i) Introduction

64. *The Standards for Educational and Psychological Testing, (2014)*, Published by the American Educational Research Association, American Psychological Association, and the National Council on Measurement in Education) (*Standards*) (2014) were developed to "provide criteria for the development and evaluation of tests and testing practices and to provide guidelines for assessing the validity of interpretations of test scores for the intended test uses…. All professional test developers, sponsors, publishers, and users should make reasonable efforts to satisfy and follow the *Standards* and should encourage others to do so. All applicable standards should be met by all tests and in all test uses unless a sound professional

reason is available to show why a standard is not relevant or technically feasible in a particular case." *Id*. at 1.

65. *The Standards* have been incorporated into federal law. S*ee* 34 CFR 668.148(a)(2)(iv**)** ("This document [*Standards*] has been duly INCORPORATED BY REFERENCE into federal regulations and shall be considered legally binding upon all citizens and residents of the United States of America.") In *AMERICAN SOC. FOR TESTING v. Public. Resource. Org*, 896 F. 3d 437 (D.C. Cir. 2018), the publisher of the *Standards* was a party and the Court held its *Standards* were published in the federal register and incorporated into federal law.) *Affirmed* by *Georgia v. Public. Resource. Org, Inc*., 140 S. Ct. 1498 (2020).

66. "Tests used in credentialing are designed to determine whether the essential knowledge and skills have been mastered by the candidate. The focus is on the standards of competence needed for effective performance." *See Standards* p. 175. The goal of the selection system is to predict [entry-level] performance immediately upon or shortly after hire. *Id*. at 170.

67. The *Standards* establish three benchmarks for licensing exams that must be met to pass judicial review: ***Validity***, ***Reliability***, ***Fairness***.

**(ii) *Validity***

68. Under the *Standards*, *validity* analysis addresses the question of whether the proposed *interpretations* and uses of the test scores make sense and are justified.

*Validity* refers to the degree to which evidence and theory support the interpretations of test scores for proposed uses of tests. *Validity* is the most fundamental consideration in developing tests and evaluating tests. It is the *interpretations* of test scores for proposed uses that are evaluated, not the test itself. *Id*. at 11. *Validity* concerns the question — does the test score measure what it is supposed to measure? Identifying the propositions implied by a proposed test interpretation can be facilitated by considering rival hypotheses that may challenge the proposed interpretation. *Id*. at 12. For example, if you are testing for AIDS the results must be valid; a positive result means the person has AIDS and a negative result means the person does not have AIDS.

69. In this case, Plaintiffs aver requiring a licensed attorney to take a second or third or fourth *subjective* bar exam that is supposed to measure entry-level skill does not conform with testing *Standards*. "As in all scientific endeavors, the quality of the evidence is paramount. A few pieces of solid evidence regarding a particular proposition are better than numerous pieces of evidence of questionable quality." *Ibid*. Much like learning to drive, law students study the same body of law and learn the same skills. They take a substantially similar and functionally equivalent licensing test. There is no evidence that licensed drivers in one state are more of less competent or trustworthy than licensed drivers in other states. The same holds true for licensed attorneys in one state versus another. A given interpretation may not be

warranted either as a result of insufficient evidence in support of it or as a result of credible evidence against it. *Id*. at 13. Every licensed attorney except those admitted in Wisconsin by diploma privileges, has already passed a state's bar exam. There is no evidence these already licensed attorneys are not competent or will fail to familiarize themselves with local law.

70. In fact, the Supreme Court has held, "There is no evidence to support appellant's claim that nonresidents might be less likely to keep abreast of local rules and procedures. Nor may we assume that a nonresident lawyer — any more than a resident — would disserve his clients by failing to familiarize himself with the rules." …There is no reason to believe that a nonresident lawyer will conduct his practice in a dishonest manner." *Piper*, 470 U.S. at 285-286

71. Several ABA studies have concluded that experienced attorneys should not have to take a second state's bar exam because their prior experience as practicing lawyers demonstrates both their competence and that they are not a threat to the public. The U.S. Supreme Court has held professional norms articulated by the American Bar Association are "(s)tandards to which we have referred as 'guides to determining what is reasonable.'" *Wiggins v. Smith*, 539 US 510, 524 (2003).

72. The *ABA Commission on Ethics 20-20* (2012) found no reason to believe that lawyers who have been engaged in the active practice of law for three of the last seven years will be any less able to practice law in a new jurisdiction than a law

school graduate who recently passed the bar. The ABA squarely recommends that in light of ever-increasing advances in technology that all states should adopt bar admission on motion for lawyers with three years of experience. Forty-two states have adopted admission on motion for sister-state attorneys in some form.

73. Likewise, the Uniform Bar Examination (UBE) is a standardized bar examination developed by the NCBE that offers portability of scores across state lines. The UBE is adopted in thirty-eight jurisdictions. The UBE does not test state law. A novice lawyer admitted in any UBE state is eligible for reciprocal licensing in all UBE states, and thus in the District Courts located in those thirty-eight states.

74. What do testing experts say? Dr. Stephen P. Klein and Dr. Bolus are nationally recognized psychometricians that specialize in bar exams. Dr. Klein, in published writings, emphasizes the danger caused by using 100% subjective high-stakes tests in isolation. *See* Stephen P. Klein, "What Do Test Scores in Texas Tell Us?" (Published 2000 by RAND) Dr. Klein admits:

> "Our research results illustrate the danger of relying on statewide test scores as the sole measure of student achievement when these scores are used to make high-stakes decisions about teachers and schools as well as students. We anticipate that our findings will be of interest to local, state, and national educational policymakers, legislators, educators, and fellow researchers and measurement specialists."

75. Likewise, Dr. Susan Case, the Director of Testing for the National Conference of Bar Examiners (NCBE), avows that non-multiple choice format tests, such as essay and performance tests "because of their limitations, such as low

reliability, lack of anonymity, and lack of standardization, *should not be used in isolation*." *See* Susan M. Case, "Licensure In My Ideal World," *The Bar Examiner*, p. 27 November 2005.

76. Likewise, Dr. Geoff Norman is a nationally recognized testing expert with over thirty years of experience. Dr. Norman is one of the experts writing a chapter in the *Cambridge Handbook of Expertise and Expert Performance*. Dr. Norman writes:

> "Study after study has shown that it is almost impossible to get judges to agree on scores for essay answers."

*See* "So What Does Guessing the Right Answer Out of Four Have to Do With Competence Anyway?" *The Bar Examiner*, p. 21 (Nov 2008).

77. Likewise, studies by the United States Judicial Conference reveal: "(N)o one has yet devised an examination which will test one's ability to be a courtroom advocate." *Report and Tentative Recommendations of the Committee to Practice in the Federal Courts in the Judicial Conference of the United States*. 79 F.R.D. 187, 196. "Lawyers with previous trial experience are much more likely to turn in very good performances, and it permits the inference that experience improves the quality of trial performance." *Id*. at 196. There is a correlation between the quality of trial performance and the prior experience of the attorneys evaluated. 83 F.R.D. at 222.

78. The licensing of printing presses based on *content* was outlawed in the 17th Century. Lawyers and judges nominated for service as federal judges by custom

and habit refuse to offer answers to questions of law. They know that if they provide their legal opinion they may be rejected because of partisan politics. Requiring already licensed attorneys to take a second entry-level bar exam is a judicial *ipse dixit* example of "do as I say, not as I do."

70. As noted above, questions of law are often dependent on facts. Facts and law are intertwined. Skill in the development and investigation of facts is not tested on a bar exam. There is no evidence or reason to conclude that *all* already licensed lawyers are ineffective or incompetent at developing and investigating facts. The practice of law is an open book process. There is no evidence or reason to conclude that all already licensed lawyers are ineffective and incompetent at developing and investigating the law. The law is also often in flux.

80. The above noted cumulative evidence demonstrates that requiring already licensed lawyers to reinvent the wheel exam and take and pass a second state's *subjective* entry-level bar exam to qualify for District Court *general* admission privileges fails to meet the ***validity*** *Standard*.

**(iii) *Reliability***

81. Chapter 2 of the *Standards* focuses on *Reliability/Precision and Errors of Measurement*. In *interpreting* and using test scores, it is important to have some indication of their *reliability*. *Standards,* at p. 33. The term has been used in a general sense, to refer to the consistency of scores across replications of a testing procedure,

regardless of how this consistency is estimated or reported (e.g., in terms of *standard error*s, reliability coefficients per se. …The reliability/precision of measurement is always important. However, the need for precision increases as the consequences of decisions and interpretations grow in importance. *Ibid*.

82. *Standard* 2.0, provides: “Appropriate evidence of reliability/precision should be provided for the interpretation for each intended score use.” *Id.* at 42. That is, the degree by which the graders on the subjective test sections agree with themselves. The *standard error of measurement* error is another way of referencing the correlation coefficient.

83. Plaintiffs, on information and belief, aver the bar exams for experienced attorneys in the States of Arizona, Alaska, Washington, Oregon, Utah, and Hawaii, do not provide reliability/precision measurements that prove their licensing tests meets the *Standard*. This is a telling omission because testing experts, noted above, have concluded that subjective tests should not be used in isolation for high-stakes professional licensing decisions.

84. If the results of a test are not *reliable*, by definition, they are not *valid*. This cumulative evidence provides compelling proof that requiring already licensed attorneys to take and pass a second state’s *content-based* subjective tests to establish entry level competence is not a *valid* or *reliable* testing measure. It is not *rational* to ignore or reject nationally recognized *Standards*.

85. The practice of law is open book. Experienced licensed attorneys have already passed the same *National Conference of Bar Examiners* objective multiple choice and subjective licensing tests. Requiring them to take and pass the same entry-level licensing tests is not a valid or reliable testing mechanism as forum state lawyers are not required to reinvent the wheel.

86. The test results for the Arizona and California subjective licensing exam for experienced attorneys are inadmissible as evidence under the *Federal Rules of Evidence* 701 series and the *Daubert* standards because the results are neither *valid* nor *reliable*, and they contradict the ABA legal industry licensing standard of reciprocity. Plaintiffs aver the *subjective* tests constitute junk science: Garbage in, garbage out. Even if the subjective tests constitute only fifty percent of the second state's licensing exam, the results still fail to meet the *Standards* for validity, reliability, and fairness.

**(iv) *Fairness In Testing***

87. The importance of fairness as a fundamental issue in protecting test-takers and test-users applies to all aspects of testing. *See Standards*, Chapter 3 *Fairness In Testing* p. 49. Fairness considers "the technical properties of tests, the ways in which test results are reported and used, and the factors that affect the validity of score interpretation, and the consequences of test use. *Ibid*. Fairness considers the broad goal of achieving equality of opportunity in our society. *Ibid*. Fairness is a

fundamental validity issue and requires attention throughout all stages of test development and use. *Ibid*. Measurement bias is "a central threat in fairness in testing." *Ibid*. A fair test does not advantage or disadvantage some individuals because of characteristics irrelevant to the intended construct. *Id* at 50

88. "A long literature demonstrates that the bar exam is a seriously flawed means of protecting the public from incompetent lawyers." *See* Andrew M. Perlman, *A Bar Against Competition: The Unconstitutionality of Admission Rules for Out-of State Lawyers,* GEORGETOWN JOURNAL OF LEGAL ETHICS Vol. 18:135, 147, n. 2 (2004)

89. Deborah Jones Merritt is the Distinguished University Professor at The Ohio State University Moritz College of Law. She has studied bar exams and the attorney licensing process, and as a result authored Merritt & Cornett, *Building a Better Bar* (2020). Prof. Merritt has opined the *best evidence* of "competence" is experience practicing law. As Prof. Merritt states —licensed lawyers have learned a skill set. They know how to practice law.

90. Joan W. Howarth is the Distinguished Visiting Professor, Boyd School of Law, UNLV Dean Emerita, Michigan State University College of Law. Dean Howarth is the author of *SHAPING THE BAR: THE FUTURE OF ATTORNEY LICENSING* (forthcoming 2022, Stanford University Press). She concludes lawyers should be licensed after clinical residencies and not by written exam. She opines the

best evidence of an attorney's competence is actually practicing law. According to Professors Merritt and Howarth "skill" is what clients want.

91. According to the ABA's "MacCrate Commission," nine out of ten fundamental lawyering skills cannot be tested on a pen and paper bar exam.[11] Under *Standard* 11.13: "The content domain to be covered by a credentialing test should be defined clearly and justified in terms of the importance of the content for credential-worthy performance in an occupation or profession. A rationale and evidence should be provided to support the claim that the knowledge or skills being assessed are required for credential-worthy performance in that occupation and are consistent with the purpose for which the credentialing program was instituted." *Id*. at 181-82.

92. In light of *Piper* and *Friedman*, it is fundamentally unfair to require already licensed attorneys to reinvent the wheel when the *best evidence* of their competence is their prior experience as a licensed attorney and having passed a bar exam and admitted to the profession by court order, when nine out of ten fundamental lawyering skills are not tested.

[11] *See* Bedford T. Bentley, Jr. "Rethinking the Purpose of the Bar Examination," *The Bar Examiner*, February 2009 p. 17("The bar examination cannot and does not test many of the skills identified by the MacCrate Report as fundamental to the successful practice of law.") Nine out of the ten skills identified as fundamental are not tested on the bar exam.

93. It is also fundamentally unfair to lump already licensed attorneys with recent law school graduates who have never practiced law because the cognitive science of *expertise* and *expert performance* proves excellence is the product of experience and that it cannot be predicted. *See* K. Anders Ericsson, Ed., *The Cambridge Handbook of Expertise and Expert Performance* (Cambridge University Press 2006). K. Anders Ericsson is the leading pioneer in this cross-disciplinary field. Cognitive scientists have concluded that it takes 10,000 hours to develop true expertise in any field, taking the brain this long to assimilate all that it needs to know to achieve true mastery.

94. It is also fundamentally unfair because the science of *expertise* and *expert performance* proves that experts surpass novices, those new to a profession, in seven major ways: (a) generating the best solution; (b) pattern recognition; (c) qualitative analysis; (d) self-monitoring skills in terms of their ability and knowing what they do not know; (e) choosing appropriate strategies; (f) seeing and exploiting opportunities; and (g) cognitive effort, meaning they work faster, with less effort, and greater control. *Id*. at 27. True expertise is based on pattern recognition skills that are intuitive and developed with experience, much like an athlete's skill increases from beginner, to novice, to professional.

95. It is also fundamentally unfair to deprive licensed attorneys of their calling and livelihood when standardized testing has been shown to be biased and

incomplete. The University of California system has recently shelved the SAT and standardized tests. Albert Einstein, perhaps the most famous physicist in history, graduated in the bottom twenty percent of his class. He started out as a patent clerk because he could not get a job in physics. His college professors refused to recommend him; one of them saying “he was a lazy dog.” *See* Walter Isaacson, *Einstein, His Life And Universe* p. 35 (Simon and Schuster 2008). Einstein, on the other hand, believed his professors were jealous, antisemitic, and failed to keep up with modern developments in physics.

96. Cognitive scientists have further concluded major scientific and societal advancements are often the product of cross-pollination between fields. Science has proven diversity increases fitness (more minds at work), innovation (creativity), levels of trust, and robustness in organizations; diversity reduces error because all of us together are smarter than any of us individually; it prevents dominant coalitions from taking over because everyone has the opportunity to participate. *See* Scott E. Page, *Understanding Complexity*, “Emergence I – Why More is Different,” Lecture 6 (The Teaching Company 2009)

97. It is also fundamentally unfair to experienced attorneys to lump them with recent law school graduates because the best evidence of competence and public protection — their track record —is categorically rejected and is trumped by the

worst measure of competence, a licensing test that is neither *valid* nor *reliable* nor *fair*.

98. The principle and benefit of diversity of *viewpoint* is famously set forth by Madison in the *Federalist Paper 10*.

> *The Union as a Safeguard Against Domestic Faction and Insurrection*, "AMONG the numerous advantages promised by a well-constructed Union, none deserves to be more accurately developed than its tendency to break and control the violence of faction."

99 Plaintiffs aver clear and compelling evidence from multiple separate strands of converging relevant evidence proves subjective licensing tests for experienced attorneys fail to satisfy testing *Standards*.

**B. Scholars (In Addition to the Supreme Court) Have Concluded that State Licensing Walls Prohibiting Reciprocal Licensing Is Evidence of Economic Protection**

100. Suffolk University Law School Dean Andrew Perlman concludes: "state bar organizations have used admission rules as a method of protecting the local bar against competition from attorneys licensed elsewhere. See Andrew Perlman, *A Bar Against Competition: The Unconstitutionality of Admission Rules for Out-of-State Lawyers*, *supra*, JOURNAL OF LEGAL ETHICS Vol. 18:135, 139 (2004)

101. Dean Perlman was previously the Reporter for the ABA 20-20 Commission. That Commission conducted public hearings all over the United States and received written and oral testimony from virtually every arm of the bar. Dean

Perlman concludes "[t]hroughout much of the history of the American legal profession, few restrictions on interstate law practice existed. Professor Richard Abel found that '[u]ntil the 1930s, lawyers admitted in one state encountered few impediments in practicing in another, and many migrated in response to economic opportunities or personal preferences.'" *Id.* at 145. Indeed, "[i]n 1930–31, only five out of forty-nine jurisdictions required out-of-state attorneys to pass their bar examinations. The other forty-four jurisdictions admitted lawyers on motion as long as they had practiced for a specified period in a state that granted reciprocity; virtually every applicant was admitted." *Ibid*.

102. As proof of economic protection, Dean Perlman reasons: "State law is also much more homogenous because of the adoption of uniform codes, *Restatements*, and the like. In addition, bar examinations test similar subject matter from state to state, enabling jurisdictions to assess more easily the abilities of existing lawyers. Finally, the advent of computerized legal research has made it simpler to investigate remaining state law variations. In short, lawyering in other jurisdictions has become easier, not more challenging, and jurisdictions can have more confidence in the abilities of out-of-state attorneys." *Id*. at 146

103. One prominent legal ethicist, Professor Charles Wolfram, has captured the essence of what many commentators have found:

> "the states [today] are by and large quite restrictive about admitting out-of-state lawyers . . . . The reasons given for the restrictions are probably largely

pious eyewash. The real motivation, one strongly suspects, has to do with cutting down on the economic threat posed for in-state lawyers . . . by competition with out-of-state lawyers." *Id*. at 147.

104. According to "Comment, Commerce Clause Challenge to State Restrictions on Practice by Out-of-State Attorneys*,"* 72 Nw. U. L. REV**.** 737, 759-60 (1978), "[t]here is no reason to subject a practicing attorney who has passed a substantially similar bar examination to the same examination required of recent law school graduates. At the very least, states should accept the scores obtained by the out-of-state attorney on the Multistate Bar Examination."

105. Dean Perlman further opines: "One can even find some evidence of protectionism within many states' current exceptions to their admission rules. States frequently admit lawyers on motion when the lawyers do not compete with the in-state bar for private clients, such as local law professors, legal services attorneys (who serve indigent clients), in-house counsel (who serve a single client), and law students working in clinics (who primarily serve indigent clients). If jurisdictions had significant concerns about lawyer competence, these exceptions would make little sense. Law professors, legal service attorneys, and in-house counsel from other jurisdictions are no more likely to be familiar with local law than other out-of-state attorneys who seek admission in the state. For instance, the legal services reasoning implies that indigent clients should have access to lawyers who are otherwise

deemed to be incompetent to handle paying-client matters. That would be a surprising conclusion to hear articulated." *Id* at 148-49.

106. A competent lawyer is one who has the necessary analytical and reasoning skills to figure out the law. In short, when imposed on existing attorneys, state law exams do not appear to be tied to their stated goal of ensuring competence. *Id*. at 226-227.

107. Statistics reported in 2019 by the NCBE show over 16,000 lawyers were provided reciprocal licensing privileges and immunities in a second state that are denied to Plaintiffs. Every single one of these 16,000 lawyers are categorically disqualified for *general* admission licensing privileges in the Central District of California Court. Moreover, California licensed attorneys are not eligible for admission to the Arizona District Court because of the California does not provide general admission reciprocity to Arizona lawyers. This categorical disqualification demonstrates economic protection is the primary reason for requiring already licensed attorneys to take a second bar exam. Economic protection is not a substantial government issue for the states and is even less of a substantial interest for federal admission.

***

***

**C. Undisputed Evidence the State Bar of California 100% Subjective Bar Exam that Experienced Attorneys are Required to Take and Pass in Order to Obtain *General* Admission Privileges Does Not Merit Full Faith and Credit and Fails to Meet Nationally Recognized Testing *Standards***

108. It is well known the State Bar of California, until recently, was a mandatory public trade union that has used its membership dues to fund legislation and lobby on matters of public concern that many of its members disagree with. *See Keller v. State Bar of California*, 496 US 1 (1990). In *Keller*, the High Court in a unanimous decision reversed the California Supreme Court and held that its union polices were subject to First Amendment scrutiny.

109. The State Bar of California has repeatedly been a party in legal proceedings on matters of public concern filed in the state and federal courts. I*N RE YAGMAN*, No. 07-80153 (9th Cir 2022) filed June 22, 2022, the Ninth Circuit refused to provide Full Faith and Credit to a State Bar of California Court finding recommending the reinstatement of a prominent attorney. The Ninth Circuit reasoned California lawmakers required the State Bar of California to undergo an audit in response to its failure to properly investigate allegations against other prominent attorneys, costing consumers millions of dollars in stolen funds. The California State Auditor published a report finding that the California State Bar's weak enforcement policies had long allowed patterns of serious misconduct, especially by prominent attorneys, to go unpunished for extended periods of time. See *Yagman*, Footnote 5.

110. Recently, the State Bar of California filed a complaint seeking to disbar its former Executive Director for a pattern of mismanagement over the agency. This is not the first time. A former Executive Director pled guilty to criminal election law violations occurring in her official capacity. A former California governor shut down the State Bar of California for over six months, refusing to sign a dues bill, finding it was bloated, arrogant, oblivious, unresponsive, and that it refused to adhere to the Supreme Court's decision in *Keller*.

112. *Standard* 2.0, provides: "Appropriate evidence of reliability/precision should be provided for the interpretation for each intended score use." *Id.* at 42. The State Bar of California retain testing experts Dr. Klein and Dr. Bolus to prepare a report on each bar exam for the California Supreme Court. They provide an estimate of the reliability of inter-grader agreement by way of a correlation coefficient. That is, the degree by which the graders on the subjective test sections agree with themselves. The *standard error of measurement* error is another way of referencing the correlation coefficient.

113. The Report(s) to the California Supreme Court on the California Bar Examination (*See* Exhibit B) prepared by Dr. Klein and Dr. Bolus document the reader correlation on the 100% subjective eight-question tests given to experienced attorneys as follows:

February 2001 reader correlation .41

July 2001 reader correlation .48

February 2002 reader correlation .38

July 2002 reader correlation .40

February 2003 reader correlation .48

February 2004 reader correlation .39

July 2004 reader correlation .41

114. These Reports documenting the *standard error of measurement* prepared by Drs. Klein and Bolus have reflected a *correlation coefficient* consistent from exam to exam going back for over forty years. These test results corroborate Dr. Norman's conclusion that it is almost impossible to get graders to agree with each other on subjective scores. These results verify Dr. Case's conclusion that subjective tests lack *reliability*. These results verify Dr. Klein's conclusion that entirely subjective tests should not be used for high-stakes licensing decisions.

115. Dr. Kane previously was employed by the National Conference of Bar Examiners. His expert opinion is that inter-rater reliability of subjective tests should be in in the range of .8 to .9 ranges on a scale to one (1).

116. Dr. Phillip L. Ackerman is a Professor of Psychology at Georgia Institute of Technology; the Editor of, Journal of Experimental Psychology: Applied; a Fellow of the American Psychological Association and a member of the American Educational Research Association and the National Council on Measurement in

Education (these are the three organizations that generate the Standards on Psychological and Educational Testing). Dr. Ackerman wrote the chapter on testing in K. Anders Ericsson, Ed., *The Cambridge Handbook of Expertise and Expert Performance*, and he is one of the leading testing experts in the world. Dr. Ackerman has reviewed the State Bar's Report to the California Supreme Court on the California Bar Examination and other material he deemed necessary to form an expert opinion.

117. Dr. Ackerman's professional opinion is that California 100% subjective bar examination for experienced sister-state attorneys fails to meet the *Standards for Educational and Psychological Testing*. Multiple Standards have not been met. More particularly, Dr. Ackerman declares, under oath:

> "The scores on the Attorney's Examination are determined in a manner that is not consistent with professional standards. The reliability of the test scoring procedures fails to reach a level that would be acceptable for high-stakes testing. (Specifically, inter-rater agreement is quite low, a correlation of .48 between raters indicates only 23% shared variance among ratings; source: Klein & Bolus; Gansk & Associates 2003.) An acceptable level of reliability for such high-stakes testing would be shared variance in the neighborhood of 70% or higher (corresponding to reliability of about .84 or higher).
>
> …
>
> When the goal of inter-rater reliability is preferably in the range of .8 to .9 as noted by Dr. Kane, and the inter-rater reliability of the California Attorney's Examination is consistently reported to be below .5, there can be little doubt that the reliability of the decisions made on the basis of the scores is extremely low, and not acceptable. *See* Exhibit B.

118. Dr. Ackerman further concludes the "Attorney's Examination lacks content-related validity," and it "has never been demonstrated to have criterion

related validation, in terms of evaluating the scores on the test and comparing them to performance of practicing attorneys."

119. Dr. Gary H. McClelland, a professor at the University of Colorado at Boulder is also an expert on statistics and measurement. Dr. McClelland previously studied the Colorado bar examination and based on that study wrote "Assessing Bias in Professional Licensing Examinations by Checking Internal Consistency," 9 *Law and Human Behavior*, No. 3, p. 305 (1985). Dr. McClelland declares, under oath:

> I have reviewed Dr. Phillip L. Ackerman's "Evaluation of the Psychometric Adequacy of the California Attorney's Examination" dated February 15, 2008, and generally agree with it. Dr. Ackerman is a credible psychometrician as well. In my opinion, the lack of an explicit equating procedure for the Essay and Performance Test sections is a fatal flaw. The degree of inter-rater agreement is dreadful. I do not believe any scientist would ever publish data based on such low inter-rater agreement. *See* Exhibit B.

120. As noted above, the purpose of a bar exam is to measure entry-level competence in order to provide public protection. The State Bar of California charges out-of-state attorneys twice as much to take ½ of the test. Experienced attorneys with four years of experience are not required to take the 200 multiple choice MBE test. The MBE test results have never been shown to have any correlation what-so-ever with the practice of law or providing public protection. Dr. Klein studies show the MBE is "poor" or "very poor" predictor of attorney competence. The following charts compares bar exam results for experienced

attorneys, all of whom are ABA graduates, and recent law school graduates from ABA schools from 2007-2021:







121. According to the State Bar of California more than fifty-five percent of lawyers licensed by another state do not possess entry level competence and are a threat to the public. Almost seventy-five percent of already licensed attorneys are

borked if they take the California 100% subjective entry level test more than once. This licensing test is graded on a curve for the purpose of reducing competition from out-of-state lawyers. This counterfeit licensing test decreases access and increases attorney fees. It's a shell game.

122. Dr. Klein, in published writings, emphasizes the danger caused by using 100% subjective high-stakes tests in isolation. *See* Stephen P. Klein, "What Do Test Scores in Texas Tell Us?" (Published 2000 by RAND) Dr. Klein admits:

> "Our research results illustrate the danger of relying on statewide test scores as the sole measure of student achievement when these scores are used to make high-stakes decisions about teachers and schools as well as students. We anticipate that our findings will be of interest to local, state, and national educational policymakers, legislators, educators, and fellow researchers and measurement specialists."

123. Dr. Stephen P. Klein's admission proves California's 100% subjective bar exam for experienced attorneys is not a ***valid*** licensing test. It is an admission the results of this putative licensing test are fundamentally flawed because they are used as the sole measure of competence for experienced attorneys.

124. The Supreme Court has recognized that p*ro hac vice* admission is not a substantial equivalent to general admission privileges. Many of Plaintiff's members are categorically disqualified for *pro hac vice* admission. *Pro hac vice* admission is not available for transaction lawyers. *Pro hac vice* also denotes second-class status, not unlike separate railroad cars for Black citizens, or requiring Blacks to take a literacy test to vote, or denying gays and lesbians marriage equality.

125. There is no empirical evidence lawyers licensed in other states are not competent or a threat to the public. On the other hand, there is substantial undisputed evidence that the 100% subjective California bar exam for experienced attorneys is not a *valid* or *reliable* licensing test and it is designed and constructed to eliminate competition and provide monopoly protection. There is little difference between the 17th Century licensing of printing presses than the California bar exam for sister-state licensed attorneys.

126. The test results for this entry-level licensing exam for experienced attorneys are inadmissible as evidence under the *Federal Rules of Evidence* 701 series and the *Daubert* standards because the results are neither *valid* nor *reliable*, and they contradict the ABA legal industry licensing standard of reciprocity. Plaintiffs aver the *subjective* tests constitute junk science: Garbage in, garbage out. Even if the subjective tests constitute only fifty percent of the second state's licensing exam, the results still fail to meet the *Standards* for validity, reliability, and fairness.

127. There is no meaningful opportunity for judicial review because Article III courts often adopt state bar exam licensing law as ordained by God. The Attorney General MERRICK B. GARLAND and DOJ, to date, have turned a blind-eye to this denial of equal citizenship rights in the United States District Courthouse.

***

## FIRST CAUSE OF ACTION

## VIOLATION OF THE SEPARATION OF POWERS DOCTRINE

128. The preceding and all subsequent allegations are incorporated by reference. No court upholding local rules has addressed Plaintiffs' separation of powers argument. The allegations that the local Rule delegation of federal power to forum state licensing officials, who have not subscribed to a federal oath of office, violates the separation of powers doctrine are clear and unambiguous. They are derived and presented in large part from Justice GORSUCH's recent book, *A Republic, If You Can Keep It*.

129. First, in *Nguyen v. United States*, 539 U.S. 69 (2003), the Court considered the question whether a panel consisting of two Article III judges and one Article IV judge had jurisdiction. The Article IV judge did not have life tenure and Article III Court protections. The DOJ argued this structural error had been waived by failure to object and it was harmless error. The Supreme Court reversed and remanded for a new hearing by Article III judges.

130. Second, states are prohibited from exercising federal legislative power. Article I § 1 of the Constitution provides, "All legislative Powers herein granted *shall* be vested in a Congress of the United States, which *shall* consist of a Senate and House of Representatives." States do not have a shred of jurisdiction over many of the enumerated powers including admiralty, bankruptcy, copyrights, federal

taxation (individual, partnership, corporation, estate and gift tax), immigration, patents, trademarks, or to prescribe rules necessary and proper for the adjudication of federal claims in the federal courts. Whole swaths of law are not tested on any state's bar exam related to the exclusively federal subjects of admiralty, bankruptcy, copyrights, immigration, patents, trademarks, or federal taxation.

131. Third, states are prohibited from exercising Article III Court judicial duties. Federal district courts are national courts and have jurisdiction over cases arising under the Constitution. District Judges are nominated by the President and confirmed by the Senate. They take an oath of office. Article III Court jurisdiction and power is necessary, according to the Great Chief Justice John Marshall because "the mere necessity of uniformity in the interpretation of the national laws decides the question. Thirteen independent courts of final jurisdiction over the same causes, arising upon the same laws, is a hydra in government, from which nothing but contradiction and confusion can proceed." *Cohens v. Virginia*, *supra*, 19 U.S. 264, 415-416 (1821). "[L]ocal Courts must be excluded from a concurrent jurisdiction in matters of national concern, else the judicial authority of the Union may be eluded at the pleasure of every plaintiff or prosecutor." *Id*. at 420. The federal delegation of power to the state to tax out-of-state lawyers abridges the First Amendment privileges. The power to tax constitutes the power to destroy.

132. Fourth, states have no power to govern bar admission in other states or in the federal courts. The right to practice law before federal courts is not governed by State court rules. *Theard v. United States*, 354 U.S. 278, 280 (1956; *Winterrowd v. American Gen. Annuity Ins. Co*. 556 F.3d 815, 820 (9th Cir. 2009). *Birbrower, Montalbano, Condon & Frank v. Superior Ct*., 17 Cal. 4th 119, 130 (1998).

133. Fifth, "when a State empowers a group of active market participants to decide who can participate in its market, and on what terms, the need for supervision is manifest." *North Carolina State Board of Dental Examiners v. Federal Trade Commission*, 135 S. Ct. 1101, 1114 (2015). State agencies controlled by active market participants pose the exact risk of self-dealing. *Ibid*. These active market participants are not angels. Even assuming the irrational propositions that federal district judges can delegate their Article III Court judicial duties solely to one state's licensing officials, that have no jurisdiction or application outside of the forum state, this federal delegation is annexed without *a* shred of supervision and without any *intelligible standard*. These local rules have no consistent standard, let alone an *intelligible standard*. This is delegation running riot.

134. Sixth, this Article III Court delegation of federal duty to state sponsored public trade unions further nullifies *Federalist Paper* 10, which holds a core benefit of our Union is to dissolve local faction. It provides:

> AMONG the numerous advantages promised by a well-constructed Union, none deserves to be more accurately developed than its tendency to break and control the violence of faction.
>
> …….
>
> By a faction, I understand a number of citizens, whether amounting to a majority or a minority of the whole, who are united and actuated by some common impulse of passion, or of interest, adverse to the rights of other citizens, or to the permanent and aggregate interests of the community.

The uneven local rules promote faction. They pit citizens of one state against citizens of another. See *The Federalist #80* ("the peace of the WHOLE ought not to be left at the disposal of a PART.")

135. Seventh, the *Code of Conduct for United States Judges*, Canon 2 provides:

> "A Judge Should Avoid Impropriety and the Appearance of Impropriety in all Activities"
>
> "(B) Outside Influence. A judge should not allow family, social, political, financial, or other relationships to influence judicial conduct or judgment. A judge should neither lend the prestige of the judicial office to advance the private interests of the judge or others nor convey or permit others to convey the impression that they are in a special position to influence the judge. "

These speech-licensing local rules on their face stem from a social, political, and financial relationship with forum state public trade unions that regularly engage in lobbying and litigation on political matters of public concern. The *Code of Conduct for United States Judges* prohibits this partnership with a political trade union.

136. Eighth, *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978) holds "[t]he limits upon federal jurisdiction, whether imposed by the Constitution or

by Congress, must be neither disregarded nor evaded." The challenged local rules are procedural rules created by the judiciary that impermissibly shrink and withdraw District Court jurisdiction without Congressional approval.

137. Defendants have a fiduciary duty as trustees of the Constitution. They have sworn an oath of office to enforce the terms of the Constitution and dispense justice equally to rich and poor alike. Plaintiffs aver that oath and fiduciary duty has been compromised because lawyers licensed in forty-nine states have been treated as inherently inferior and denied equal citizenship rights in the United States courthouse. The Constitution does not recognize classes of citizenship when it comes to recognizing citizenship rights. The humblest is the peer of the most powerful. Compelling all citizens to choose an Arizona or California attorney or forfeit their citizenship rights is not what our Framers promised in providing for the separation of powers to ensure a more perfect Union, the Blessings of Liberty, and Establishing Justice for all.

137A. In *SIEGEL v. FITZGERALD*, No. 21–44, Decided June 6, 2022, the Supreme Court squarely **held non-uniform rules denying equal access to the District Courts are unconstitutional**. These non-uniform local rules denying equal access to the District Courts are unconstitutional in light of *SIEGEL v. FITZGERALD.*

138. Plaintiffs aver the challenged local rules are facially unlawful as they flagrantly trespass the separation of powers doctrine.

**SECOND CAUSE OF ACTION**

**VIOLATION OF THE FIRST AMENDMENT**

**A. INTRODUCTION – THE LOCAL RULES NULLIFY THE FIRST AMENDMENT FREEDOMS, THEY ARE PRESUMPTIVELY UNCONSITUTIONAL, AND THEY FAIL STRICT SCRUTINY**

139. As noted above, the Supreme Court decisions *in Holder v. Humanitarian Law*, *Reed v. Town of Gilbert*, *Janus*, *Becerra,* and *Fulton* are dispositive, change the rules of the game, and undermine every prior decision upholding local rules as professional speech, rational, fair and neutral, and exempt from First Amendment protection. Plaintiffs further aver that nary a First Amendment decisions cited in this Complaint is cited in any lower court decision upholding local rules as rational.

140. In *West Virginia Bd. of Ed. v. Barnette*, 319 US 624, 638 (1943), Justice Robert Jackson famously summarized First Amendment gospel:

> The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.
>
> Equally important:
>
> "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Id*. at 642.

*Barnette* means District Judges cannot legislate and rely on local rules to prescribe First Amendment orthodoxy for any class of citizens. If Congress shall make no law abridging the freedoms to speech, association, and petition, neither can judges abridge these freedoms under the guise of local rules.

141. Justice Holmes, who was wounded three times in the Civil War, concludes: "Certitude is not the test of certainty. We have been cock-sure of many things that were not so."[12] Justice Holmes, dissenting in *Abrams v. United States*, 250 U.S. 616, 630, 631, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919), describes the First Amendment function:

> ". . . when men have realized that time has upset many fighting faiths, they may come to believe ever more than they believe the very foundations of their own conduct that the ultimate good desired is better reached by free trade in ideas — that the best test of truth is the power of the thought to get itself accepted in the competition of the market, and that truth is the only ground upon which their wishes safely can be carried out. That at any rate is the theory of our Constitution. It is an experiment, as all life is an experiment. Every year if not every day we have to wager our salvation upon some prophecy based upon imperfect knowledge. While that experiment is part of our system I think that we should be eternally vigilant against attempts to check the expressions of opinions that we loathe and believe to be fraught with death, unless they so imminently threaten immediate interference with the lawful and pressing purposes of the law that an immediate check is required to save the country. . . . Only the emergency that makes it immediately dangerous to leave the correction of evil counsels to time warrant making any exception to the sweeping command, `Congress shall make no law . . . abridging the freedom of speech.'"

---

[12] *See* Stephen Budinski, *Oliver Wendell Holmes: A Life in War, Law, and Ideas*, 497-98 (2019).

142. In *Holder v. Humanitarian Law Project*, *supra*, 561 U.S. 1, 130 S.Ct. 2705 (2010), restrictions imposed by Congress on providing material support to foreign terrorist organizations were at issue. Some of the plaintiffs were lawyers. The defendant Attorney General argued these provisions were subject to intermediate review. Chief Justice ROBERTS writing for the majority reasoned, “Plaintiffs want to speak [to the Foreign Terrorists Organizations] and whether they may do so under … depends on what they say, ” *Id*. at 2723-24, thus since the regulation is related to expression all nine justices applied strict scrutiny. *Holder* makes clear that restrictions on lawyer speech imposed by judges are subject to First Amendment strict scrutiny review and not rational basis review, even if those speech restrictions are relevant to lawyers representing foreign terrorists.

143. Plaintiffs are not terrorists. They are citizens. They do not present an immediate clear and present danger of imminent unlawful action that would warrant an exception to First Amendment protection. As noted above, Plaintiffs as licensed attorneys in good standing will not be dancing nude, publishing defamatory remarks, engaging in fraud, or inciting the public to riot in the United States Courtroom.

**B. VIOLATION OF PETITION CLAUSE AND PRIOR RESTRAINT**

144. In *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49 (1993), in construing the right to *petition,* the Court held “that litigation could only be enjoined when it is a sham. To be a sham, first, it

must be objectively baseless in the sense that no reasonable litigant could expect success on the merits; second, the litigant's subjective motive must conceal an attempt to interfere with the business relationship of a competitor …through the use of government process — as opposed to the outcome of that process — as an anti-competitive weapon." *Id*. at 60-61. Plaintiffs submit the local rules, on their face, violate the Petition Clause because they presume all licensed lawyers from forty-nine states will file sham petitions for an anti-competitive purpose and only file sham petitions.

145. Prior restraints on First Amendment rights are presumptively unconstitutional. *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558, (1975). In its simple, most blatant form, a prior restraint is a law which requires submission of speech to an official who may grant or deny permission to utter or publish it based upon its contents. *Alexander v. United States*, *supra*, 509 U.S. 544, 556. (KENNEDY dissenting). The local rules are a prior restraint because they compel the plaintiffs to pass a state administered content-based licensing exam, virtually identical to the licensing of printing presses in the 17th Century, in order to exercise their First Amendment freedoms to speak as a lawyer, associate with their client as a lawyer, and petition the government for the redress of grievances as a lawyer, in some United States Courthouses, but not others. This restraint radiates monopoly protection. This draconian requirement of passing a second entry-level

licensing test is prior restraint. It is also not a *valid*, *reliable*, and *fair* licensing test for federal admission.

146. In *Citizens United v. Federal Election Com'n*, *supra*, 558 U.S. 310, 130 S. Ct. 876, 891 (2010), the corporation was barred from publishing its view in a film about Hilary Clinton. Lawyers have a constitutional duty and function much like the press. In *Citizens United* the Court affirmed:

> "**These onerous restrictions thus function as the equivalent of prior restraint by giving the FEC power analogous to licensing laws implemented in 16th- and 17th-century England, laws and governmental practices of the sort that the First Amendment was drawn to prohibit**. (internal cites omitted). Because the FEC's "business is to censor, there inheres the danger that [it] may well be less responsive than a court—part of an independent branch of government—to the constitutionally protected interests in free expression." (internal cites omitted). When the FEC issues advisory opinions that prohibit speech, "[m]any persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech—harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." 130 S.Ct. at 895-96. (Emphasis added)

147. The Supreme Court held these FEC prior approval regulations on their face chilled the corporation's speech. There is no qualitative difference in compelling speakers to obtain a favorable advisory opinion from the FEC than a favorable opinion on a second state's entry-level bar exam.

148. There is no reason to conclude that *religious freedom* is more important than "*petition freedom*." The local rules constitute a *prior restraint* on the right to petition in the same way *Fulton* applied a prior restraint on the free exercise clause.

149. Similarly, in *Legal Services Corp. v. Velazquez*, 531 US 533 (2001), the constitutionality of prior restrictions on attorney speech enacted by Congress was at issue. The Court held the Congressionally imposed restriction on attorney speech was *facially unconstitutional*. *Id*. at 549. (Emphasis added)

**C. Viewpoint Discrimination**

150. A subject that is first defined by content and then regulated or censored by mandating only one sort of comment is not viewpoint neutral. To prohibit all sides from criticizing their opponents makes a law more viewpoint based, not less so. *Matal v. Tam*, 137 S.Ct. 1744, 1766 (2017). "A law or policy permitting communication in a certain manner for some but not for others raises the specter of content and viewpoint censorship. This danger is at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official." *Lakewood v. Plain Dealer Publishing Co*, 486 U.S. 750, 763 (1988). The government, by enforcing disparate licensing rules, suppresses the viewpoints of a disfavored class of licensed lawyers, citizens, and corporations. The central component of the First Amendment to allow the People to make their own choices and represent themselves is abridged, enlarged, and modified.

**D. Speaker Discrimination**

151. In *Citizens United v. Federal Election Commission*, 130 S.Ct. 876 (2010):

> Quite apart from the purpose or effect of regulating content, moreover, the Government may commit a constitutional wrong when by law it identifies certain preferred speakers. By taking the right to speak from some and giving it to others, the Government deprives the disadvantaged person or class of the right to use speech to strive to establish worth, standing, and respect for the speaker's voice. The Government may not by these means deprive the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration. The First Amendment protects speech and speaker, and the ideas that flow from each. *Citizens United*, 130 S.Ct. at 890
> …
>
> Any effort by the Judiciary to decide which means of communications are to be preferred for the particular type of message and speaker would raise questions as to the courts' own lawful authority. Substantial questions would arise if courts were to begin saying what means of speech should be preferred or disfavored. *Id*. at 890 (Emphasis added)

152. Plaintiffs aver the local rules deprive them of their basic rights of citizenship, dignity, and "deprive the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration." *Ibid*.

E**. Content Discrimination**

153. The Court in *Reed v. Town of Gilbert*, *supra*, 135 S. Ct. 2218 (2015) redefined "content discrimination." The "subject" and "content" of this federal discrimination is federal law and procedure, which is supposed to be uniform.

154 Lawyers throughout the United States study the same federal law and procedure in law school. They take and pass state licensing exams that are substantially similar and functionally equivalent. They rely on the same subject of federal law and procedure. The *messages* and *ideas* are the same. The challenged local rules constitute content discrimination in the same way the Arizona sign code was held to be content discrimination.

155. The alleged local Rule benign motive and absence of hostility and animus against attorneys licensed in forty-nine states does not save the California and Arizona rules from content-discrimination analysis, or the presumption that content-based laws are presumptively unconstitutional, or the government's obligation of proof under the strict scrutiny and narrow tailoring test.

**F. Right to Association and to Avoid Compelled Association**

156. In *MINE WORKERS v. ILLINOIS BAR ASSN*., 389 U.S. 217 (1967), the Illinois Supreme Court rejected petitioner's contention that its members had a right, protected by the First and Fourteenth Amendments, to join together and assist one another in the assertion of their legal rights by collectively hiring an attorney to handle their claims. The Supreme Court reversed:

> We hold that the freedom of speech, assembly, and petition guaranteed by the First and Fourteenth Amendments gives petitioner the right to hire attorneys on a salary basis to assist its members in the assertion of their legal rights.
> We start with the premise that the rights to assemble peaceably and to petition for a redress of grievances are among the most precious of the liberties safeguarded by the Bill of Rights. These rights, moreover, are intimately

> connected, both in origin and in purpose, with the other First Amendment rights of free speech and free press. "All these, though not identical, are inseparable." (internal cites omitted) The First Amendment would, however, be a hollow promise if it left government free to destroy or erode its guarantees by indirect restraints so long as no law is passed that prohibits free speech, press, petition, or assembly as such. We have therefore repeatedly held that laws which actually affect the exercise of these vital rights cannot be sustained merely because they were enacted for the purpose of dealing with some evil within the State's legislative competence, or even because the laws do in fact provide a helpful means of dealing with such an evil. *Id.* at 221-22.
>
> ….
>
> but the First Amendment does not protect speech and assembly only to the extent it can be characterized as political. "Great secular causes, with small ones, are guarded. The grievances for redress of which the right of petition was insured, and with it the right of assembly, are not solely religious or political ones. And the rights of free speech and a free press are not confined to any field of human interest. *Id*. at 223.

157. *Mineworkers* reiterates that laws that affect the exercise of vital First Amendment rights cannot be sustained because they are rational. There is virtually no qualitative difference in this 21st Century 24-7 Information Age challenge to local rules that restrict the First Amendment freedoms of licensed attorneys from forty-nine states, than the *Mineworkers* decision in 1967 overturning restrictions on unions' prohibiting them from hiring lawyers to represent their members.

158. In *NAACP v. Button*, 371 U. S. 415, 433 (1963), there was a restriction on attorney speech enacted by the State of Virginia. The NAACP claimed the law infringed the rights of the NAACP and its members and lawyers to associate for the purpose of assisting persons who seek legal redress for infringements of their

constitutionally guaranteed rights. The Supreme Court agreed and first held: "We think petitioner may assert this right on its own behalf, because, though a corporation, it is directly engaged in those activities, claimed to be constitutionally protected, which the statute would curtail. We also think petitioner has standing to assert the corresponding rights of its members." *Id*. at 428. The Supreme Court further adjudged:

> "We hold that the activities of the NAACP, its affiliates and legal staff shown on this record are modes of expression and association protected by the First and Fourteenth Amendments which Virginia may not prohibit, under its power to regulate the legal profession, as improper solicitation of legal business violative of Chapter 33 and the Canons of Professional Ethics. Id. at 428-29.

159. The High Court reasoned:

> [T]he First Amendment also protects vigorous advocacy, certainly of lawful ends, against governmental intrusion. (internal cites omitted). In the context of NAACP objectives, litigation is not a technique of resolving private differences; it is a means for achieving the lawful objectives of equality of treatment by all government, federal, state and local, for the members of the Negro community in this country. It is thus a form of political expression. Groups which find themselves unable to achieve their objectives through the ballot frequently turn to the courts. … And under the conditions of modern government, litigation may well be the sole practicable avenue open to a minority to petition for redress of grievances. *Id*. at 429-30
>
> …
>
> "Our form of government is built on the premise that every citizen shall have the right to engage in political expression and association. This right was enshrined in the First Amendment of the Bill of Rights. Exercise of these basic freedoms in America has traditionally been through the media of political associations. Any interference with the freedom of a party is simultaneously an interference with the freedom of its adherents. All political ideas cannot and should not be channeled into the programs of our two major parties.

History has amply proved the virtue of political activity by minority, dissident groups . . . ." *Id*. at 431

160. It would be difficult to find a more broad and less precise regulation than the challenged local rules that categorically inhibit the First Amendment freedoms to speech, association, and petition of lawyers licensed in forty-nine states.

161. Litigation is a form of political expression. *In re Primus*, 436 U.S. 412, 428. "It is no answer to the constitutional claims … that the purpose of these regulations was merely to insure high professional standards and not to curtail free expression." *Id*. at 438-39. The operations of the courts and the judicial conduct of judges are matters of utmost public concern. *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 839 (1978).

162. Regulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid. *Procuier v. Martinez*, 416 U.S. 396, 419 (1974).

163. The right to associate includes a right not to associate. Plaintiffs aver the local Rule compulsion that anyone who wants to petition the United States District Court for the redress of grievances must subsidize and associate with a second, third, and fourth bar association or forfeit their right to *general* bar admission privileges in the District Courts contradicts *Janus v. AFSCME*, 138 S.Ct. 2448 (2018).

164. Plaintiffs' association and freedom of conscience rights are abridged and modified as some Plaintiffs and many lawyers object to paying union dues and saluting state flags that stand for partisan politics they disagree.

**THIRD CAUSE OF ACTION**

**VIOLATION OF SIXTH AMENDMENT RIGHT TO COUNSEL**

165. The preceding and all subsequent allegations are incorporated by reference.

166. The right to counsel in a criminal and in a civil case are fundamental rights. The reasons for the fundamental right to counsel are set forth in *Powell v. Alabama*, 287 US 45, 60 (1932)

> The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he has a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence. If that be true of men of intelligence, how much more true is it of the ignorant and illiterate, or those of feeble intellect? *Id* at 68 – 69

167. "Assistance of counsel" is "deemed necessary to ensure fundamental human rights of life and liberty" without which justice cannot be done. *Gideon v. Wainwright*, 372 US 335, 343 (1963)

168. Plaintiffs aver the local rules that categorically disqualify licensed lawyers from 49 states trespass the Sixth Amendment right to counsel.

**FOURTH CAUSE OF ACTION**

**VIOLATION OF 28 U.S.C § 1738**

169. The preceding and all subsequent allegations are incorporated by reference.

170. Plaintiffs allege that the claim that local rules trespass 28 U.S.C § 1738 has never been addressed by any decision upholding local rules. Some lower courts have analyzed this question under the Constitutional Full Faith and Credit Clause, rather than the specific terms of 28 U.S.C § 1738 and the Supreme Court cases interpreting this section.

171. *General* admission licensing privileges provide a public office that has particular value to the Plaintiffs as an association of licensed lawyers, individual lawyers, and clients, and to citizens who may want to choose counsel from a nationwide market of legal know-how. Citizens also have a substantive right to counsel and to petition federal courts with counsel.

172. 28 U.S.C. § 1654 *Appearance personally or by counsel* provides:

> In all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein.

173. U.S.C. § 1738 *State and Territorial statutes and judicial proceedings; full faith and credit*:

> "The records of any Court or State are admissible in evidence, and such records shall have the same full faith and credit in every court within the United States as they have by law or usage in the Courts of any such State from which they are taken."

174. Every lawyer is admitted to the bar by a judgment of professional competence by an act and record of a state supreme court. Section 1738 commands that state supreme courts acts and records are entitled to full faith and credit in every United States District Court. "Regarding judgments, … the full faith and credit obligation is exacting." *Baker by Thomas v. General Motors Corp.*, 522 U.S. 222, 233 (1998). There is "no roving 'public policy exception' to the full faith and credit due *judgments*." *Ibid.* (emphasis in original).

175. In *United States v. Windsor*, 133 S.Ct. 2675 (2103), the Court held the federal government is required to accord same sex citizens equal rights and their marriage licenses full faith and credit. The rights to counsel, association, and petition are textually embedded in the Constitution. They predate the fundamental right to marriage equality by over two hundred years. If citizens have a fundamental right to choose their spouse, regardless of race, national origin, or gender, Plaintiffs aver they have a fundamental right to choose their counsel. A citizen's right to choose independent counsel is priceless.

176. The law *is* what the law *says*. The challenged local rules are facially unlawful as they trespass the Congressional command set forth in 28 U.S.C. § 1738. They further abridge, enlarge, and modify 28 U.S.C. § 1738 in a single sweep.

**FIFTH CAUSE OF ACTION**

**VIOLATION OF 28 U.S.C. § 332(d)4)**

177. The preceding and all subsequent allegations are incorporated by reference.

178. Plaintiffs are not aware of any court decision rejecting challenges to local Rules that remotely discuss the Judicial Council obligations to review local rules for consistency with *Acts of Congress* (Section 2071) or the 28 U.S.C.§ 2072 standard ”shall not abridge, enlarge, or modify any substantive right.”

179. Plaintiffs allege the local rules in the Third Circuit contradict the Judicial Council’s periodic duty to review the local rules; the local rules in the Third Circuit on their face trespass *Federal Rules of Civil Procedure* 1, 83, 28 U.S. C. § 332(d)4), and 28 U.S.C.§§ 2071-72.

**SIXTH CAUSE OF ACTION**

**VIOLATION OF *FEDERAL RULES OF CIVIL PROCEDURE***

180. The *Federal Rules of Civil Procedure* “govern the procedure in all civil actions and proceedings in the United States district courts.” FRCP 1. Hence, the scope applies to all federal civil actions and proceedings. The purpose is “to *secure*

*the just, speedy, and inexpensive determination of every action* and proceeding. (Emphasis added) *Ibid.* The *Federal Rules of Civil Procedure* 83(a)(1) command: "A local Rule must be consistent with… federal statutes and rules adopted under 28 U.S.C. § 2072."

181. Plaintiffs allege the challenged local rules do not "secure the just, speedy, and inexpensive determination of every action:" (i) when all lawyer in 1/3 of the District Courts including the Western District of Pennsylvania can obtain *general* admission privileges by filing a certificate of good standing and paying a District Court admission fee of $200; (ii) other lawyers admitted in tit-for-tat states, such as Arizona, can obtain federal admission by reciprocity or UBE transfer can and paying a $1500 admission on motion tax to Arizona, and a District Court $200 admission fee; (iii) and lawyers in California can obtain *general* admission privileges by filing a certificate of good standing, paying a District Court admission fee of $200, and paying a $2000 tax to take and pass a subjective test that is less reliable than flipping a coin.

182. The California and Arizona local rules are mirror opposites. If a citizen from California sues a citizen from Arizona on a federal claim in federal court in California, the Arizona citizen or corporation is also a party. If the first to file or venue is in California, it is arbitrary and capricious to compel the Arizona citizen to hire a California lawyer. Likewise, if venue is in Arizona, it is equally arbitrary to

compel the California citizen to hire an Arizona lawyer on identical federal claims. The same holds true on jurisdiction based on diversity. Diversity claims are governed by the *Federal Rules of Civil Procedure*. The purpose of diversity jurisdiction is to provide a neutral forum. The purpose of the *Federal Rules of Civil Procedure* is defeated by the Local Rule reliance on forum state law or office location on both federal and diversity claims in the district courts.

183. The Supreme Court has held *pro hac vice* admission is not an equivalent substitute for *general* admission privileges. *Pro hac vice* admission is qualitatively no different than requiring Black people to stand in the rear of the bus, take a literacy test to vote, or requiring women to obtain their spouse's permission to undergo a medical procedure, or treating gay people as second-class citizens.

184. The Supreme Court has held office location or residence has nothing what-so-ever to do with attorney competence or trustworthiness.

185. California's long-standing and sordid tradition of divvying up *citizenship* rights and providing monopoly protection for California lawyers is preempted by the *Federal Rules of Civil Procedure*. Much like the Virginia's ban on the admission of women at the Virginia Military Institute, the California District Court's tradition of awarding, what in practical effect are Titles of Nobility for local lawyers and badges of inferiority to attorneys licensed elsewhere — abridges, enlarges, and modifies the *Federal Rules of Civil Procedure* and Article I § 10.

## SEVENTH CAUSE OF ACTION

186. The preceding and all subsequent allegations are incorporated by reference.

187. Article I § 10, in pertinent part provides: "No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, *except what may be* ***absolutely necessary for executing it's inspection Laws***." (Emphasis Added). The Supreme Court has held legal services are a central component of interstate commerce. If States shall not lay taxes except "*what may be absolutely necessary for executing it's inspection Laws*" than neither can Article III judges. The local rules authorize States to tax the federal substantive rights of out-of-state licensed attorneys ***that are not absolutely necessary for its inspection Laws***. These taxes and imposts are not ***absolutely necessary*** because they are not levied in the Supreme Court, the United States Courts of Appeals, practice before federal administrative agencies, and practice before one-third of the 94 federal district courts. These state taxes and duties are levied without the consent of Congress. Everyone knows the power to tax constitutes the power to destroy. Congress has specifically declared that local rules shall be consistent with Acts of Congress and "shall not abridge, enlarge, or modify and substantive right."

188. In the past, the Hon. Attorney General MERICK B. GARLAND has refused to recognize he and his office are bound by *Holder v. Humanitarian Law*.

His office and associates also refuse to recognize the decision in *Giannini v. Real*, 911 F.2d 354 (9th Cir. 1990) upholding California District Court local rules as *rational* reveals it was wrongly decided the day it was filed. There, the Ninth Circuit applied the *Rules Enabling Act* Congress earlier revoked. The case was argued and submitted on May 8, 1990. It was decided August 16, 1990. The decision was written by Ninth Circuit and later Chief Judge Proctor Hug. Judge Hug's analysis of the "*Claims Against the Federal Defendants*," states:

> **B. Rules of the Supreme Court**
>
> Giannini also alleges that the challenged local rules are inconsistent with the Rules of Practice and Procedure of the United States Supreme Court. We disagree.
> **28 U.S.C. § 2071(a) (1988)** states that:
>
> The Supreme Court and all courts established by Act of Congress may from time to time prescribe rules for the conduct of their business. Such rules shall be consistent with Acts of Congress and rules of practice and procedure prescribed [by the Supreme Court]. *Id.* at 360.

189. His Honor analyzed the challenged California local rules under the 28 U.S.C. § 2071(a) **(1988) version** of the *Rules Enabling Act* in 1990 that had already been revoked at the time the decision was filed. The *Commentary to the 1988 Revision* reveals Congress amended 28 U.S.C. 2071 in 1988 and deleted the reference to the Supreme Court and replaced it with reference to Section 2072 "shall not abridge, enlarge, or modify any substantive right." Judge Hug cited the earlier

law when that law had been buried and rejected by Congress almost two years before his decision.

190. Plaintiff alleges, back then, before the internet and computer revolution, *West Publishing* updated the federal statutes at the end of the year in a pocket supplement. Judge Hug, perhaps, made an honest mistake based on the available technology. But we know now, he made a mistake, and for thirty years now other Courts have been citing *Giannini v. Real* as gospel, when it was wrongly decided when it was filed. That decision trespasses the fourfold barreled standard of review for local rules. Judge Hug's opinion also does not cite to 28 U.S.C. § 332(d)(4), or *Federal Rules of Civil Procedure* 83(a)(1), which was amended in 1995 specifying Section 2072 as the standard for local rules.

191. Plaintiffs further aver Judge Hug's analysis under the Full Faith and Credit Clause is misplaced. Plaintiffs rely on 28 U.S.C. § 1738 the full faith and credit statue. This statute is materially different from Article IV full faith and credit clause.

192. Plaintiffs aver Judge Hug's analysis of *Frazier v. Heebe*, averring it applied rational basis review, today more than thirty years later, is obviously further flawed because rational basis is not appropriate for First Amendment claims and the professional speech doctrine has been overturned.

193. Plaintiffs further aver Judge Hug's decision thirty-two years ago is entirely irrelevant today because it was not argued or decided under the First Amendment and the alleged facts and claims have changed.

194. Plaintiffs aver lower courts all over the United States, at the urging of the defendant Attorney General MERICK B. GARLAND'S office, have latched onto Judge Hug's clearly erroneous misapplication of the *Rules Enabling Act* conclusion as gospel. If rational basis is the standard of review for local rules than the *Rules Enabling Ac*t enacted by Congress is a meaningless nullity.

195. In sum, prior decisions holding local rules as rational and exempt from review under 28 U.S.C. 2071-72 and 332(d)(4) misread the statute, disregard *Federal Rules of Civil Procedure* 1 and 83(a)(1), and pay no attention to *Becerra*, *Janus, Gilbert, Fulton, Barnette, Humanitarian Law,* or the Bill of Rights.

## EIGHTH CAUSE OF ACTION
## VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENT EQUAL PROTECTION, EQUAL CITIZENSHIP RIGHTS, AND EQUAL PRIVILEGES AND IMMUNITIES

196. The preceding and all subsequent allegations are incorporated by reference.

197. As noted above, "[b]ut in view of the Constitution, in the eye of the law, there is in this country no superior, dominant, ruling class of citizens. There is no caste here. Our Constitution is color-blind, and neither knows nor tolerates classes among citizens. In respect of civil rights, all citizens are equal before the law. The

humblest is the peer of the most powerful. The law regards man as man, and takes no account of his surroundings or of his color when his civil rights as guaranteed by the supreme law of the land are involved." *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896), John Marshall Harlan dissenting. Plaintiffs are treated as second class *citizens* by the local rules.

198. Plaintiffs aver that local rule in this 21st Century are revolting. *See* Holmes, *The Path of the Law*, 10 Harv. Law Rev. 457, 469 ("[i]t is revolting to have no better reason for a rule of law than it was laid down in the time of Henry IV. It is still more revolting if the grounds on which it is based have long since vanished, and the rule simply persists from blind imitation of the past.")

199. The rules further trespass the Fourteenth Amendment, which incorporates the First Amendment, the right to travel, the Privileges and Immunities and Equal Protection Clauses. In *Saenz v. Roe*, 526 US 489 (1999), the Court held the Fourteenth Amendment Privileges and Immunities Clause includes:

> The "right to travel" discussed in our cases embraces at least three different components. It protects the right of a citizen of one State to enter and to leave another State, the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and, for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State. *Id*. at 500.

"Personal liberty," it has been well said, "consists in the power of locomotion, of changing situation, or removing one's person to whatsoever places one's own inclination may direct, without imprisonment or restraint, unless by due course of

law." *United States v. Stanley*, 109 US 3, 39 (1883). The local rules abridge, enlarge, and modify each of these Fourteenth Amendment Privileges and Immunities of American citizenship.

200. In *United States v. Windsor*, 133 S. Ct. 2675 (2103), the Court held the federal government is required to accord same sex citizens equal rights and their marriage licenses full faith and credit in the federal context. If citizens have a right to choose their spouse and religion, they have a right to choose their independent counsel.

201. Plaintiffs further aver this federal licensing discrimination carried out under the guise of local rules cannot even survive rational basis review. If it is irrational to disqualify a bar applicant for licensure because of oath as in *Schware v. Bd. of Bar Examiners*, 353 U.S. 232 (1957), or because they are Democrat or Republican, or black, or female, or gay, or Jew or Gentile, it is equally arbitrary and irrational to disqualify an experienced attorney from District Court admission based on what state they are or are not licensed.

**NINTH CAUSE OF ACTION**

**UNCONSTITUTIONAL CONDITIONS**

202. The preceding and all subsequent allegations are incorporated by reference.

203. "A law that takes property from A. and gives it to B: It is against all reason and justice." *Calder v. Bull*, 3 US 386, 387 (1798). The local rules take the

Plaintiffs' privileges and immunities and citizenship rights and gives them to local lawyers — constitutes an unconstitutional condition. It is against all reason and justice.

204. The Court has also invalidated restrictions on an attorney's opportunity to practice law under a strict scrutiny standard of review under the Privileges and Immunities Clause. In *Supreme Court of New Hampshire v. Piper*, 470 U.S. 274 (1985), the Supreme Court held:

> **The lawyer's role in the national economy is not the only reason that the opportunity to practice law should be considered a** "**fundamental right**." We believe that the legal profession has a noncommercial role and duty that reinforce the view that the practice of law falls within the ambit of the Privileges and Immunities Clause.[fn11] **Out-of-state lawyers may — and often do — represent persons who raise unpopular federal claims. In some cases, representation by nonresident counsel may be the only means available for the vindication of federal rights**. *Id*. at 281-82. (Emphasis added)

205. The upshot of *Piper* is that a licensed attorney's opportunity to practice law is a constitutionally protected fundamental right that is necessary for the vindication of federal rights in our more perfect Union. The right protected by the [Privileges and Immunities Clause] include: "**The right of a citizen of one state to pass through, or to reside in any other state, for purposes of trade, agriculture, professional pursuits, or otherwise; to claim the benefit of the writ of habeas corpus**; **to institute and maintain actions of any kind in the courts of the state**;

to take, hold and dispose of property, either real or personal . . . ." *Piper*, 470 U.S. at 280 fn. 10.

206. *Piper* also cites: “A former president of the American Bar Association has suggested another possible reason for the rule: "Many of the states that have erected fences against out-of-state lawyers have done so primarily to protect their own lawyers from professional competition." (internal cites omitted) This reason is not "substantial." The Privileges and Immunities Clause was designed primarily to prevent such economic protectionism. *Piper*, 470 U.S. at n. 18.

207. *Piper* also reasons, “There is no evidence to support appellant's claim that nonresidents might be less likely to keep abreast of local rules and procedures. Nor may we assume that a nonresident lawyer — any more than a resident — would disserve his clients by failing to familiarize himself with the rules.” …”There is no reason to believe that a nonresident lawyer will conduct his practice in a dishonest manner. *Id* at 285-286

208. The Supreme Court has held the Privileges and Immunities Clause applies when the challenged law discriminates in *practical effect* or serves as a *proxy* for discrimination against out-of-state citizens and residents. *Hillside Dairy Inc. v. Lyons*, 539 US 59, 67 (2003). Plaintiffs allege the *practical* effect of the local rules is to discriminate against out-of-state attorneys and a create a *proxy* for preferential

patronage for in-state attorneys. They take citizenship rights from A and give them to B.

209. Following *Piper*, *Supreme Court of Virginia v. Friedman*, 487 U.S. 59 (1988) squarely holds that *bar admission on motion* (without taking another bar exam) for sister-state attorneys is a constitutionally protected Privilege and Immunity. The Court concluded: "The issue instead is whether the State has burdened the right to practice law, a privilege protected by the Privileges and Immunities Clause, by discriminating among otherwise equally qualified applicants solely on the basis of citizenship or residency. We conclude it has." *Id*. at 67. The norm under the Privileges and Immunities Clause is comity, i.e. reciprocity. The Supreme Court stated, "we see no reason to assume that nonresident attorneys who, like Friedman, seek admission to the Virginia bar on motion will lack adequate incentives to remain abreast of changes in the law or to fulfill their civic duties." *Id*. at 69.

210 The local rules on their face and in practical effect discriminate against all out-of-state attorneys and all citizens by compelling everyone to hire a forum state lawyer or forfeit their statutory and constitutional right to counsel in the federal courthouse. As noted above, the historical meaning of the Clause to "**institute and maintain actions of any kind in the courts of the state.** " (Emphasis added) *Piper*, 470 U.S. at 280 fn. 10. The Art. IV 2 and Fourteenth Amendments Privileges and

Immunities Clauses are inextricably intertwined with the First Amendment liberties. Liberty presumes an autonomy of self that includes the freedom of thought, belief, expression, and certain intimate conduct including the priceless right to independent counsel. The local rules contradict the Supreme Court's precedent on bar admission set forth in *Piper* and *Friedman*.

**TENTH CAUSE OF ACTION**

**VIOLATION OF THE FIFTH AMENDMENT DUE PROCESS &**

**28 U.S.C. § 455**

211. The preceding and all subsequent allegations are incorporated by reference.

212. The constitutional right to Due Process is a substantive right. Plaintiffs aver the local rules abridge, enlarge, and modify their substantive rights to procedural due process in two separate contexts.  First, Plaintiffs cannot get a fair and neutral judge when federal judges have previously partnered themselves with and adopted forum state interests as their own. They forfeit their required neutrality by exclusively aligning themselves with forum state law. Plaintiffs cannot get a fair and impartial hearing when federal judges have predetermined the viewpoints of one state's lawyers and one state's licensing protocols are superior to another. They have a vested interest in the conflict. There is an appearance of bias. This conflict of interest abridges, enlarge, and modifies the recusal statute. 28 U.S.C. § 455.

213. Second, the entry-level testing process per se for licensed lawyers' trespasses Plaintiffs' right to procedural due process by leaving Plaintiffs at the whim of their state competitor. Plaintiffs' right to petition the state supreme court for review of their bar exam scores is not available in practice as state supreme courts never grant review.

214. Plaintiffs further allege in order to overcome 28 U.S.C. § 1738*, the Rules Enabling Act*, and the Bill of Rights the District Court should have the burden of proof to establish by clear and compelling evidence that the original state of licensing order of admission was secured by fraud, mistake, or duress.

Plaintiffs therefore request the following relief:

- An Order, Preliminary Judgment, and Judgment declaring local rules that deny *general* bar admission privileges to otherwise qualified attorneys in good standing based on forum state law or office location in the Ninth Circuit are unlawful and providing injunctive relief enjoining such local rules.

- An Order. Preliminary Judgment, and Judgment declaring local rules that deny *general* bar admission privileges to otherwise qualified attorneys in good standing based on forum state law or office location throughout the United States are unlawful and provide injunctive relief enjoining such local rules.

- Costs.
- Attorney fees.
- Grant such other relief as may be just and proper.

Dated: June 29, 2023

Respectfully submitted,

/s/ *Joseph Robert Giannini*

Joseph Robert Giannini, Esq.
PA State Bar 38814
12016 Wilshire Blvd. Suite 5
Los Angeles, CA 90025
Phone 310 804 1814
Email holmes@lawyers-inc.com